UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Civil Action No.: 9:22-cv-80417-RAR

LA POTENCIA, LLC, a
Delaware limited liability company,
and YC52, LLC d/b/a CHANDLER BATS,
a Florida limited liability company,

        Plaintiff,

v.

DAVID CHANDLER, an individual,
GROUP AUTHENTIC, LLC, a Delaware
limited liability company, MAXBAT,
INCORPORATED, a Minnesota corporation,
PECOS LEAGUE OF PROFESSIONAL
BASEBALL CLUBS, LLC, a Texas limited
liability company, BESTBATDEALS.COM,

        Defendants.
_____/


**PLAINTIFFS' PRE-HEARING BRIEF IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs, LA POTENCIA, LLC ("La Potencia"), and YC52, LLC d/b/a CHANDLER BATS ("YC52") (collectively "Plaintiffs"), by and through undersigned counsel, hereby submit their Pre-Hearing Brief in support of their Motion for Preliminary Injunction [ECF No. 82] against Defendants, DAVID CHANDLER, GROUP AUTHENTIC, LLC, MAXBAT, INCORPORATED, PECOS LEAGUE OF PROFESSIONAL BASEBALL CLUBS, LLC, and BESTBATDEALS.COM (collectively "Defendants") and state:

## I.    INTRODUCTION

Plaintiffs are seeking preliminary injunctive relief to prohibit Defendants' blatant trademark infringement, use of Plaintiffs' stolen trade secrets and use of Confidential Information that David Chandler contractually agreed not to disclose. In 2019, La Potencia acquired the Chandler Bats business from RxSport, Corp, David Chandler's prior company, including <u>all</u> trademarks, tradenames, know-how, trade secrets, formulas, source and business identifiers, and all goodwill associated therewith.  David Chandler had developed formulas and processes at RxSport for making high quality wood baseball bats using furniture techniques he learned prior to making baseball bats. RxSport transferred those processes to La Potencia, along with the "Chandler Bats," "Chandler" and "C Chandler and Design" marks, and YC52, as La Potencia's licensee, continued the Chandler Bats business making high quality wood baseball bats using those marks and processes.  Chandler bats, or "Chandlers," are well-known throughout Major League Baseball for their durability, hard finish and high-performance engineering and are one of the top four MLB bat brands available along with Louisville Slugger, Victus and Marucci.

However, in 2019, immediately after transferring all assets to RxSport, David Chandler formed Group Authentic with the intent of continuing to make bats.  In 2021, he located a manufacturer – MaxBat – and, in 2022, he began selling baseball bats through Group Authentic

using the mark "Authentic by David Chandler" and using the exact same processes RxSport transferred to La Potencia. On the trademark side, use of "Chandler" in Defendants' trademark is clear cut infringement. It is literal use of the identical "Chandler" mark/name and has caused an abundance of actual confusion that will be presented at the hearing. At the outset, preliminary injunctive relief is needed to preclude use of that infringing mark.

On the trade secret side, the parties exchanged their manufacturing processes during discovery and confirmed that Defendants are in fact using Plaintiffs' exact formulas, ingredients and processes to make Defendants' bats. David Chandler visited MaxBat in late 2021 on a few occasions to train them in person on how to make his bats and then emailed MaxBat a written document he created in January 2022 setting forth in detail the exact formulas, ingredients and processes he used to make bats while at RxSport – the same formulas, ingredients and processes he transferred to La Potencia. Thus, use of Plaintiffs' trade secrets is clear.

Indeed, Defendants do not appear to dispute that Defendants are using Plaintiffs' trade secrets but rather claim now that the formulas, ingredients and processes are not protectable trade secrets. However, at the outset, that argument ignores that RxSport transferred them to La Potencia and, regardless of whether they are trade secrets, Defendants cannot use the formulas and processes that were transferred to La Potencia. Moreover, the evidence will show that David Chandler maintained his formulas, ingredients and processes at RxSport as absolutely confidential by, for example, requiring NDAs from employees, removing labels from various ingredients, keeping certain ingredients locked or hidden, keeping vendor information protected and only allowing himself or very limited other persons to order materials. YC52 now goes to great lengths on the same lines and more to continue to maintain it all as absolutely confidential. Defendants' contention that ingredients such as the finishes are publicly available does not negate trade secret

3

protection because, in addition to the fact that Plaintiffs' ingredients and suppliers are kept confidential, the unique combination and configuration of the Chandler Bats' formulas and processes are not publicly accessible but rather maintained with absolute confidence and are protectable trade secrets. It is the same reason that neither MaxBat nor any other wood bat manufacturer has been able to duplicate Chandler Bats until David Chandler disclosed the confidential information to MaxBat. Indeed, David Chandler provided MaxBat with a detailed document he created identifying the formulas, ingredients and processes rather than simply referring MaxBat to the manufacturer's instructions. And any contention by Defendants that Plaintiffs' bats can be reverse engineered fails as will be explained because theoretical reverse engineering is not a defense to trade secret theft after the trade secret theft has already occurred.

Moreover, even if not trade secrets, David Chandler agreed in the subject Loan Agreement not to disclose Confidential Information to any third party. Confidential Information was defined to include the methods and procedures to make the Chandler bats. Thus, Defendants' contention that the methods and procedures are not trade secrets is irrelevant because David Chandler violated the confidentiality provision when he disclosed such information to MaxBat. Thus, Defendants should be absolutely barred from making bats with those formulas.

Finally, Defendants' effort to distract from the real issues by calling this a "shareholder dispute" is a baseless red herring. La Potencia provided a traditional loan to RxSport in the amount of $700,000, which was subject to a typical Loan Agreement. RxSport eventually defaulted and agreed to transfer all of the assets to satisfy the debt. This is not a shareholder dispute, but rather a dispute over trademarks, trade secrets and confidential information where the evidence clearly and unambiguously demonstrates that Plaintiffs are substantially likely to succeed on such claims. Thus, preliminary injunctive relief is warranted and necessary.

## II. BRIEF SUMMARY OF EVIDENCE

**1.   Trademark Infringement.**

**A.   The Chandler Marks.**

It is undisputed that La Potencia is the registered trademark holder of the "Chandler Bats" and "C Chandler and Design" marks. Defendants are estopped from contesting the validity of such marks. *See* 3 McCarthy on Trademarks and Unfair Competition § 18:16, *Effect of valid trademark assignment – Assignor estoppel* ("Trademark registration assignor estoppel is an equitable rule which prevents the assignor of a registered trademark from challenging the validity of the assigned trademark in a subsequent suit for infringement brought by an assignee against the assignor."). In addition to those registered rights, RxSport transferred "all" trademarks to La Potencia, which included common law rights, and all goodwill associated therewith. RxSport used the mark "Chandler" continuously for years, and the rights and goodwill in "Chandler" were also transferred. Moreover, David Chandler previously filed a letter of consent to use with the USPTO for use of his name in connection with the Chandler Bats and C Chandler and Design marks, as well as "Chandler" alone as a trademark.

**B.   Summary of Actual Confusion.**

Plaintiffs identify the Eleventh Circuit's likelihood of confusion factors in their Motion and intend to submit evidence in support of all of the factors. Plaintiffs and Defendants are selling identical goods (wood baseball bats) to the same customers (MLB players, minor league players and amateur players) and via the same sale channels (primarily through direct consumer sales and some online sales and retail store sales). The marks are identical, as Plaintiffs' own trademark registrations for "Chandler Bats" and the "C Chandler and Design" marks, as well as hold common law rights in "Chandler," while Defendants' are using the mark "Authentic **by David Chandler**."

Defendants' "by David Chandler" goes on every single infringing bat. And, David Chandler's prior company, RxSport, transferred all of the marks to La Potencia, so there is clear intent.

While the factors all support a likelihood of confusion, "'[i]t is undisputed that evidence of actual confusion is the best evidence of a likelihood of confusion.'" *PlayNation Play Systems, Inc. v. Velex Corp.*, 924 F.3d 1159, 1167 (11th Cir. 2019) (citations omitted). "While numerous instances of actual confusion add greater weight in favor of confusion, 'the quantum of evidence needed to show actual confusion is relatively small.'" *Id. (citing Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 937 (11th 2010)). "Evidence that ultimate consumers were actually confused deserves 'special attention.'" *Id.* In *PlayNation*, the Eleventh Circuit found that two instances of actual confusion were sufficient because they were consumers of the products, and consumers are given special weight. *Id.* at 1167-68. Those customers had mistakenly contacted defendant's customer service rather than contacting the plaintiff. *Id.*

Here, Plaintiffs will be submitting several instances of actual confusion – most involving actual consumers of their products. For example, potential customers have reached out to Chandler Bats inquiring about Defendants' bats. One customer asked "Are your Authentic Chandler bats a lower grade model from your standard Chandler bats." Additionally, a MLB clubhouse thought the Chandler Bats' sales team visited when it was actually Defendants' sales team. Also, just recently on June 24, 2023, a top prospect amateur player who uses Chandler Bats posted a picture on his Instagram page holding a Group Authentic by David Chandler bat but tagged Chandler Bats.

Moreover, during discovery, Defendants recently deposed Josh Morgan, a minor league player who has used both Chandler Bats and Defendants' bats (transcript being provided). He testified, when asked if there has ever been confusion between Chandler Bats and Defendants' bats: "There was when I did my first bat fitting in 2022 because I had never heard of Authentic

Chandler, so I thought it might have been the same thing." 23:10-16. Thus, he testified expressly that he was at least originally confused, and even still today calls Defendants' bats "Authentic Chandler."[1] Indeed, one of the actual confusion incidences referenced in Plaintiffs' Motion is where Josh Morgan's agent mistakenly ordered Chandler Bats in January 2023 when Josh Morgan intended to order Defendants' bats. When asked about it, Josh Morgan testified: "Well, I said to my agent that I was ordering Authentic Chandler, which I thought that was what the bat company was named, Authentic Chandler; and it just must have been a misunderstanding." 19:7-19. Of course there was a misunderstanding when he spoke to his agent, because he used "Chandler" interchangeably, which is the entire point of prohibiting trademark infringement to prevent confusion in the marketplace. Notably, when asked about Chandler Bat's products, Josh Morgan testified: "I love them. It's the bat that I've been swinging this whole year. And the specs of the bat, the weight, everything, how hard the wood is, it's a very good wood product." 11:3-8.

To the extent Defendants argue that any of Plaintiffs' actual confusion evidence is hearsay, "[t]he majority of courts have held either that testimony of plaintiff's employees as to confused customers is not hearsay because it is not offered to prove the truth of any customer's assertion or is admissible under an exception to the hearsay rule." 4 McCarthy on Trademarks and Unfair Competition § 23:15 (5th ed. 2019); *see also Canes Bar & Grill of South Florida, Inc. v. Sandbar Bay, LLC,* 343 F.Supp.3d 1236, 1245-46 (S.D. Fl. 2018) (finding actual confusion evidence "probative of the declarant's statement of mind" because the evidence had "independent evidentiary value tending to show actual confusion" where the plaintiff's principal received reports

---

[1] Even though he eventually understood that Chandler Bats and Defendants are separate, this was still "source confusion" sufficient to show likelihood of confusion. *PlayNation*, 924 F.3d at 1167, n. 4 (two consumers calling the wrong phone number was "source confusion" where they testified that they believed the parties' products "were produced by the same company") (citing *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1222 n. 9 (11th Cir. 2008).

7

of confused consumers by way of posts and messages).  Moreover, regardless of actual confusion, courts may generally consider hearsay materials at the preliminary injunction stage. *Id.* at 1246.

The evidence will clearly demonstrate a likelihood of confusion to support injunctive relief to prohibit Defendants' blatant trademark infringement.

**C.     Defendants' Expert.**

Defendants cannot contest the actual confusion evidence.  So, as a red herring, they retained an expert who purportedly conducted a survey on likelihood of confusion.  In other filings in this case, Defendants have suggested that Plaintiffs should have retained a survey expert because surveys have become more common in infringement.  But that is in cases where there is <u>no evidence of actual confusion</u> – surveys are a substitute when there is no actual confusion.  Indeed, in Defendants' recent Response brief (ECF No. 134), they cite McCarthy on trademarks for their proposition.  But McCarthy went on to state that "while survey evidence has become more common, that does not mean it is needed, required or introduced in the majority of cases" and that a study found "'[W]e find no evidence that surveys are used by a majority or even a large plurality of litigants to prove likelihood of confusion in federal court.'" 6 McCarthy § 32:195; *see also* Defendants' case *Wag'N Enterprises, LLC v. United Animal Nations*, 2012 WL 1633410, *8 (E.D. Va. 2012) ("[P]laintiff's failure to produce **either evidence of actual confusion** or a survey weighs heavily against a finding of infringement.") (emphasis added).  Indeed, as noted above, the Eleventh Circuit in *PlayNation* found two instances of consumer confusion alone sufficient. 924 F.3d at 1167-68.  Surveys may be helpful when there is no actual consumer confusion but they are not necessary when there is actual consumer confusion, which is substantially more persuasive.

Additionally, there are numerous flaws in the surveys and opinions of Defendants' expert that will be addressed at the hearing.  For example, the "Authentic by David Chandler" logo in the

8

image shown to consumers during the survey was not even legible. Additionally, her survey was almost exclusively limited to parents with kids, whereas the true market for wood baseball bats is minor and major league baseball players (or amateur players just below that level in wood bat leagues.). The flaws in her survey can easily be seen by the fact that her survey participants confused Plaintiffs' bats with all of the other brands almost equally across the board, which suggests the entire survey was skewed and/or participants did not understand. Her survey does nothing to counteract the actual confusion that has occurred amongst actual consumers.

Finally, David Chandler recently submitted letters of protest to the USPTO against new applications filed by La Potencia for its "Chandler Bats" and "C Chandler and Design" marks. In each letter of protest, he stated "when the applied for Mark [i.e., "Chandler Bats or "C Chandler and Design"] is used with Applicant's goods or services, a connection with Mr. Chandler would be presumed." Thus, he expressly admitted a likelihood of confusion in those letters of protest.

### D. Secondary Meaning

One of the factors for likelihood of confusion is strength of the mark, and where a mark is based on the name of an individual, whether the mark has acquired secondary meaning is considered. "A mark obtains a secondary meaning ... when, in the minds of the relevant consuming public, the 'primary significance of the term … is not the product but the producer." *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 950 F.3d 776, 784 (11th Cir. 2020). "When a product is 'targeted at only a specific segment of the general public,' the relevant consuming public consists only of those targeted consumers—not the public at large." *Id.* at 784, n. 3 (relevant consuming public was people interested in buying/selling a home in the subject neighborhood) (*quoting* 2 McCarthy on Trademarks and Unfair Competition § 15:46 (5th ed. 2019)). Moreover, evidence of consumer confusion is probative of secondary meaning. *Caliber*, 605 F.3d at 939, n. 36.

Here, the evidence clearly demonstrates that the Chandler marks have acquired secondary meaning in the relevant consuming public. They are well known throughout all of professional baseball (as well as amateur players that use wood bats) and are now one of the top four bats sold to MLB players. The current biggest name in baseball – Shohei Ohtani – hits Chandler bats. Aaron Judge, who set the American League record in 2022 for most home runs in a season at 62, hits Chandler bats. The MLB all-star game is set to take place next week on July 11, 2023, and MLB flyers promoting the game show players holding Chandler bats with the noticeable C Chandler design and logo front and center of the bat. That is common, and Chandler Bats has become a household name with baseball players, especially because Chandler Bats has worked hard to promote, advertise and create a highly reputable brand for its bats. Moreover, Defendants recently deposed Edward Paparella, who is a hitting strategist with the Seattle Mariners minor league program who oversees approximately 80-100 players. When asked what were the most popular brands of bats his players hit, he responded: "I would say Louisville, Birdman – Louisville Birdman. Some guys swing Chandler and Old Hickory. I would say those are the big ones that a lot of guys use." 30:21-31:3. He confirmed that he meant Chandler Bats when he said "Chandler." 31:4-7. Additionally, when asked what he thought about Chandler Bats when he swung one during summer ball, "I thought it was great quality." 31:15-32:1. It is clear the Chandler marks have acquired secondary meaning.

Defendants' expert also provided a survey and report on secondary meaning. Again, there are numerous flaws that will be exposed at the hearing. For example, she again surveyed primarily parents rather than the relevant consuming public – i.e., pro baseball players or actual players who hit wood bats. She did not even request information from Plaintiffs on who Plaintiffs' bats are sold to and that would not have changed her survey because her "assignment" was specifically to

10

survey the retail side – not professionals. Again, surveys can be useful when actual evidence is not available. Here, secondary meaning is crystal clear based on actual usage by baseball players. Thus, a survey conducted by a litigation expert hired by the Defendants to provide a helpful opinion for them cannot be used to overcome evidence in the actual marketplace.

**2.      Trade Secrets**

   **A.      Confirmation of Trade Secret Use by Defendants.**

During discovery, the parties exchanged their manufacturing ingredients, formulas and processes for Plaintiffs' Chandler Bats and Defendants' infringing bats. Plaintiffs initially provided a detailed interrogatory answer identifying its ingredients, formulas and processes, and also produced a document that David Chandler provided La Potencia at the time of transfer of the assets regarding the Chandler Bats ingredients, formulas and processes. Defendants then responded with their information – MaxBat provided a detailed interrogatory answer identifying its ingredients, formulas and processes used to make Group Authentic's bats (and now some of its own bats). Group Authentic and MaxBat also produced a document created by David Chandler identifying ingredients, formulas and processes that David Chandler provided to MaxBat via email in January 2022. Those records confirm that David Chandler provided MaxBat with Chandler Bat's ingredients, formulas and processes he used while at RxSport and had provided to La Potencia. MaxBat is now using the same exact materials and ingredients from the same suppliers and vendors as Chandler Bats in the same configurations and combinations as used to make Chandler Bats. Those detailed trade secrets will be specifically identified at the hearing for Plaintiffs to identify the specific relief it is seeking.

Additionally, MaxBat is now making its own, non-Group Authentic, bats using Plaintiffs' trade secrets. In fact, MaxBat's president made it clear in February 2022 that he wanted to use

11

David Chandler's finish on MaxBat bats as part of their arrangement – i.e., so that MaxBat could make its own bats like Chandler Bats, which it is doing now. A party can misappropriate another's trade secret by either acquisition, disclosure, or use. *Compulife Software Inc. v. Newman,* 959 F.3d 1288, 1311-13 (11th Cir. 2020).

### B. Defendants' Reverse Engineering Contentions.

Defendants do not appear to dispute that they are using Plaintiffs' trade secrets but rather claim now that the very trade secrets David Chandler went to lengths to protect at RxSport are now somehow not protectable trade secrets. Initially, Defendants recently, after 11:00 pm ET on June 30, 2023, disclosed a purported expert report of Dr. Nejad regarding inspection of Plaintiffs' bats. Plaintiffs object to Dr. Nejad's report and her testifying due to the late disclosure (and there is no time to depose her prior to the start of the hearing, and June 30 was the discovery deadline anyway).

Regardless, Dr. Nejad's report is irrelevant. Defendants appear to intend to offer her to suggest that Plaintiffs' bats could be reverse engineered, and Dr. Nejad has provided a report that her team was able to inspect Plaintiffs' bats and determine *some* of the ingredients. Defendants provided her with all of Plaintiffs' trade secret information, so she essentially had an answer key to begin with – but her students still were not able to detect at least some of the ingredients.

More importantly, even if they had detected all of the ingredients and/or Dr. Nejad testifies that she could reverse engineer Plaintiffs' bats with more time, Defendants misplace the law on reverse engineering. Specifically, a defendant can only allege reverse engineering as a defense to trade secret theft when the defendant *actually reversed engineered the plaintiff's product* to acquire the trade secrets – the fact that a third party could hypothetically reverse engineer a plaintiffs' product is not a defense. *See Mallet and Company Inc. v. Lacayo*, 16 F.4th 364, 387 n. 31 (3d Cir. 2021) ("The Defendants would also have us insulate trade secret thieves from liability as long as

12

reverse engineering of a secret was hypothetically an available alternative to access the trade secret information. We decline to do so. The DTSA expressly addresses the relationship between reverse engineering and trade secret misappropriation. And it excludes reverse engineering from the type of conduct it defines as misappropriation. 18 U.S.C. § 1839(6). But while 'reverse engineering is a defense to misappropriation of [a] trade secrets claim, the possibility that a trade secret *might* be reverse engineered is not a defense.' [citations omitted] . . . To hold otherwise would fly in the face of commonsense and allow a defendant to escape liability for unlawfully stealing trade secrets as long as someone might – hypothetically and at unknown cost in time, effort, and money – figure out some means to discover them through reverse engineering."); *Bal Seal Eng'g, Inc. v. Nelson Products, Inc.*, 2018 WL 4697255, at *4 (C.D. Cal. Aug. 3, 2018) (stating "the possibility that a trade secret *might* be reverse engineered is not a defense" and finding "the fact that many elements of a canted coil spring *could* be reverse-engineered does not defeat the claim") (emphasis in original); *GateGuard, Inc. v. Amazon.com Inc.*, 2023 WL 2051739, *15 (S.D.N.Y. Feb. 16, 2023) (whether trade secrets were discovered through improper means not impacted by "whether or not a third party with authorization to access the device could theoretically 'reverse engineer' its design"); *Medtronic MiniMed, Inc. v. Nova Biomedical Corp.*, 2009 WL 10672947, at *2 (C.D. Cal. Aug. 14, 2009) ("The fact that a matter may be *susceptible* of independent development or reverse engineering does not thereby make it 'generally known' or 'readily ascertainable by proper means.' It is actual, not theoretical, independent development or reverse engineering that serves as a defense."); *Compulife,* 959 F.3d at 1312 n. 14 ("The defendants here don't argue that they reverse-engineered any trade secret, so we needn't address the reverse-engineering question").

  Here, MaxBat testified that it did not reverse engineer Plaintiffs' bats. David Chandler did not reverse engineer Plaintiffs' bats. Rather, David Chandler disclosed Plaintiffs' trade secrets to

13

MaxBat based on his knowledge acquired while at RxSport. Thus, any theoretical reverse engineering cannot serve as a defense to Defendants' trade secret theft here.

### C. The Confidentiality of the Chandler Bats Trade Secrets.

Moreover, the evidence will show that David Chandler maintained his formulas, ingredients and processes at RxSport as absolutely confidential by, for example, requiring NDAs from employees, removing labels from various ingredients, keeping certain ingredients locked or hidden, keeping vendor information protected and only allowing himself or very limited other persons to order materials. When RxSport transferred the formulas and processes, David Chandler provided a document he created to La Potencia outlining the processes and formulas, which has been kept in a vault at outside counsel's office. On those same lines, the testimony and evidence will demonstrate that YC52 goes to great lengths to continue to maintain the trade secrets as absolutely confidential – including having certain supplies delivered only to certain employees who do not know what those supplies are used for, keeping various materials locked, keeping unlabeled containers that simply say "A" or "B" for mixing and requiring NDAs of its employees.

Defendants' contention that ingredients such as the finishes are publicly accessible and the manufacturer's instructions provide how to apply such finishes does not alter the fact that those specific ingredients and suppliers are maintained in confidence and, even if one were to learn the identity of one or more ingredients or suppliers, the combination and configuration of the various ingredients (which are ordered from different suppliers), as well as the combination and configuration of the processes, methods and procedures used to make wood bats from those ingredients, are not publicly accessible but rather maintained with lock and key. Indeed, "'Courts have long recognized that 'a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and

14

operation of which, in unique combination, affords a competitive advantage and is a protectable secret.'" *Mallet*, 16 F.4th at 386; *see also Capital Asset Research Corp. v. Finnegan,* 160 F.3d 683, 686 (11th Cir. 1998) ("Even if all of the information is publicly available, a unique compilation of that information, which adds value to the information, also may qualify as a trade secret."); *Compulife,* 959 F.3d at 1314 (While "the scraped quotes were not *individually* protectable trade secrets because each is readily available to the public ... that doesn't in and of itself resolve the question whether, in effect, the database *as a whole* was misappropriated. Even if quotes aren't trade secrets, taking enough of them must amount to misappropriation of the underlying secret at some point. Otherwise, there would be no substance to trade-secret protections for 'compilations,' which the law clearly provides."); *Jabil Inc. v. Essentium, Inc.*, 2020 WL 708140, *4 (M.D. Fla. February 12, 2020) ("A unique configuration of components, even if they are publicly available, may be considered a trade secret.").

The unique configuration and combination of Chandler Bats' formulas, ingredients, methods and procedures used to make its bats are not publicly accessible and give Chandler Bats a competitive advantage. That is the reason that neither MaxBat nor any other wood bat manufacturer has been able to duplicate Chandler Bats until David Chandler disclosed the confidential information. When David Chandler disclosed the formulas, ingredients and processes to MaxBat, he provided a detailed document he created with the information. If it were so easy to duplicate Plaintiffs' bats based on the manufacturer's instructions, he simply could have provided MaxBat those instructions and told them to make the bats based off those. That would not have been possible though. Plaintiffs' formulas, ingredients and processes are trade secrets.

### 3. Confidential Information

Regardless of trade secret theft, the Loan Agreement also contained a confidentiality provision enforceable against David Chandler. *Loan Agreement*, ¶ 4.10(a). That provision defined "Confidential Information" to include RxSport's "methods and procedures," "trade secrets," "contracts," and "customer lists" among many other things. That provision went on to expressly prohibit David Chandler from "disclos[ing] any Confidential Information to any other person or entity for any reason whatsoever." It also provided that "Chandler agrees that all Confidential Information is owned exclusively by [RxSport]," "that Chandler may use the Confidential Information only for the benefit of [RxSport]," and "that Chandler will at all times take such action as shall be necessary to maintain the confidentiality of the Confidential Information and to prevent its unauthorized disclosure." *Loan Agreement*, ¶ 4.10(a).

As discussed, in January 2022, David Chandler admittedly sent MaxBat a document detailing the methods, ingredients and procedures to make Defendants' bats. Those were the same methods, ingredients and procedures used to make RxSport's bats – the same methods, ingredients and procedures provided by RxSport to La Potencia. Thus, David Chandler breached the confidentiality provision on those grounds alone regardless of trade secret protection, and Section § 4.10(c) of the Loan Agreement provides for injunctive relief for any violation.

### III.   CONCLUSION

Plaintiffs request that the Court enter a preliminary injunction to preclude Defendants' trademark infringement, use of Plaintiffs' trade secrets and use of Plaintiffs' Confidential Information. However, the trademark claims are not reliant on the trade secret claims or confidential information claims and vice versa, and each claim is independent of the others.

Dated: July 5, 2023                              Respectfully submitted,

By: /s/ Joshua D. Martin
Joshua D. Martin
Florida Bar No. 028100
josh.martin@johnsonmartinlaw.com
JOHNSON & MARTIN, P.A.
500 W. Cypress Creek Rd., Suite 430
Fort Lauderdale, Florida  33309
Telephone:  (954) 790-6699
Facsimile:  (954) 206-0017

Perry S. Clegg (*Pro Hac Vice*)
perry.clegg@johnsonmartinlaw.com
JOHNSON & MARTIN, P.A.
50 W. Broadway, Suite 900
Salt Lake City, Utah 84101
Telephone:  (801) 783-3200

*Attorneys for Plaintiffs, La Potencia, LLC and YC52, LLC d/b/a CHANDLER BATS*

## CERTIFICATE OF SERVICE

I hereby certify that the counsel of record who are deemed to have consented to electronic service are being served on July 5, 2023 with a copy of this document via the Court's ECF system.

/s/ Joshua D. Martin
Joshua D. Martin