## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 22-CV-80417-RAR

**LA POTENCIA, LLC** and
**YC52, LLC** d/b/a **CHANDLER BATS**,

      Plaintiffs,

v.

**DAVID CHANDLER**, *et al.*,

      Defendants.

_____/

### <u>ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

When it comes to baseball, perhaps no other sound captures the spirit of the game better than the crack of the bat.  And baseball bats have come a long way since the late 1800s.  From ash to hickory to maple, bats have consistently evolved from the early days of America's pastime in the search for a perfect hitting surface.  Here, in the race to find the best-performing bat for today's game, the Court is presented with two baseball bat manufacturers at odds over their intellectual property—with one seeking trademark and trade secret protection in the form of a preliminary injunction.  Specifically, before the Court is Plaintiffs', LA POTENCIA, LLC ("La Potencia") and YC52, LLC d/b/a CHANDLER BATS ("YC52") Renewed Motion for Preliminary Injunction ("Motion"), [ECF No. 82], against Defendants, DAVID CHANDLER ("David Chandler"), GROUP AUTHENTIC, LLC ("Group Authentic"), MAXBAT, INCORPORATED ("MaxBat"), PECOS LEAGUE OF PROFESSIONAL BASEBALL CLUBS, LLC ("Pecos"), and BESTBATDEALS.COM ("BestBatDeals.com").  Plaintiffs move for a preliminary injunction to stop Defendants from manufacturing and selling baseball bats using their alleged trade secrets and to enjoin Defendants from using the "Authentic by David Chandler" mark.

The Court permitted the parties to conduct discovery in advance of the Preliminary Injunction Hearing ("Hearing"), [ECF Nos. 76, 136], and the parties submitted briefs on July 5, 2023, [ECF Nos. 148, 149], in preparation for the Hearing, held on July 10, 2023 [ECF Nos. 99, 100]. The Court conducted the Hearing between July 10 and July 20, 2023. Following the Hearing, the Court permitted the parties to take additional expert depositions and submit Supplemental Briefs and responses thereto on November 1, 2023, [ECF Nos. 228, 229]. The parties submitted their Responses to the Supplemental Briefs on November 15, 2023, [ECF Nos. 235, 236]. After extensions provided to facilitate mediation efforts, Plaintiffs and Defendants submitted Proposed Findings of Fact and Conclusions of Law ("PFFCL") on January 12, 2024, and responses on February 9, 2024. The Motion became ripe for ruling when the parties submitted supplemental responses to the PFFCL on March 5, 2024, [ECF Nos. 280, 281]. The Court having carefully reviewed the pleadings, the record, the testimony at the Hearing, the relevant caselaw, and being otherwise fully advised, it is

**ORDERED AND ADJUDGED** that Plaintiffs' Renewed Motion for Preliminary Injunction is **GRANTED** as set forth herein.

## FINDINGS OF FACT[1]

The Court finds that the following facts have been established by a preponderance of the evidence.[2]

---

[1] The findings of fact rely, in part, on the testimony and evidence presented at the Hearing, *see* Vol 1., [ECF No. 172], Vol. 2, [ECF No. 183], Vol. 3, [ECF No. 184], Vol. 4, [ECF No. 173], Vol. 5, [ECF No. 170], Vol. 6, [ECF No. 174], Vol. 7, [ECF No. 175], Vol. 8, [ECF No. 171]. The Court also considered the depositions of Dan O'Rourke, Edward Paparella, and Josh Morgan conducted during pre-Hearing discovery and the parties' expert materials, available as exhibits to Defendants' Post-Hearing brief, *see* [ECF Nos. 228-4] ("Nejad Tr."), [ECF No. 228-30] ("Fisher Tr."), [ECF No. 228-34] ("O'Rourke Tr."), [ECF No. 228-36] ("Paparella Tr."), [ECF No. 228-38] ("Morgan Tr."). The Court references Hearing exhibits by their exhibit name (*e.g.*, "P18"). [ECF Nos. 182, 188, 192, 193].

[2] *See Carbone v. Ocean Breeze Recovery, LLC*, No. 15-61700, 2015 WL 11201203, at *1 n.1 (S.D. Fla. Oct. 7, 2015) (applying a preponderance of the evidence standard and citing *Univ. of Tex. v. Camenisch,*

## I.  Plaintiffs' Chandler Bats

Plaintiff YC52, as a licensee of La Potencia, LLC, manufactures, markets, and sells wood baseball bats to Major League Baseball ("MLB") players, Minor League Baseball players, and other athletes, including amateurs.   Vol. 1, 85:11–13; 139:18–140:10. However, a significant portion of their business—and the primary target—consists of selling bats to professional players. *Id.*  YC52 sells all its baseball bats through the CHANDLER BATS (US Trademark Registration Nos. 4,503,473) and C CHANDLER and Design (U.S. Trademark Registration No. 4,542,834) trademarks and tradenames.   *See* United States Patent and Trademark Office ("USPTO") Trademark Registrations, [ECF No. 82-2]; Vol. 1, 97:23–98:6.

## II.  The History of Chandler Bats

YC52's bats are made using the process and formula that David Chandler developed for maple baseball bats around 2008, which he began selling through RxSport the following year. Vol. 5, 217:23–218:5; 232:3–235:17; Vol. 6, 20:14–16.  Prior to 2008, David Chandler used his background as a furniture maker—where he learned to design and manufacture high-end furniture with ███████████████████████████████████—to make maple bats that would not break and splinter like the varieties that MLB players historically used. Vol. 6, 115:2–12; Vol. 5, 192:24–197:2, 205:21–207:18, 215:16–218:16, 225:25–226:8.

These initial bats were made with



David Chandler commercialized the bats through RxSport and sold them using the "Chandler Bats" or "Chandler"

---

451 U.S. 390, 395 (1981) for the proposition that findings of fact and conclusions of law made in connection with an order granting a preliminary injunction are not binding at a trial on the merits).

brand, based on his surname. Vol. 6, 9:20–11:1; 14:12–15, 20:14–25, 117:6–118:19, 172:4–12; Ex. P18.  In 2014, RxSport obtained U.S. Trademark Registration No. 4,503,473 for the word mark "CHANDLER BATS," with a date of first use of December 1, 2010, Ex. J1, and U.S. Trademark Registration No. 4,542,834 for the "C CHANDLER and Design" mark/logo (collectively, "Chandler Bats Marks" or "Chandler marks" or "Plaintiffs' marks"), with a date of first use of December 1, 2010, Ex. J2:



David Chandler provided express written consent to the USPTO to use and register his surname as a part of the CHANDLER BATS mark and Chandler Bats Logo in a "Consent to Use and Registration of Name," dated September 30, 2013.  Ex. P18.

### III.  Transfer of Assets from RxSport to La Potencia

In 2017, La Potencia, a company owned by Yoenis Céspedes, provided a $700,000 loan to RxSport.  Ex. J59; Vol. 1, 87:21–88:1; 201:24–203:2.  Specifically, on April 27, 2017, RxSport entered into an Amended and Restated Loan Agreement ( "Loan Agreement") with La Potencia, which was signed by David Chandler, that provided capital to RxSport to operate RxSport's business of manufacturing, marketing, and selling baseball bats and related products; as collateral for the loan, La Potencia received a security interest in RxSport's assets.  Ex. J59 §§ 1.1, 1.4; Vol. 6, 59:21–60:16.  Contemporaneous with the Loan Agreement, RxSport and La Potencia signed an Amended and Reinstated Security Agreement, dated April 27, 2017 ("Security Agreement").  Ex.

J60.  The Loan Agreement further contained a Confidentiality Provision wherein David Chandler acknowledged that he had "acquired and added to the confidential information of a special and unique nature and value relating to [RxSport] and its financial operations."  Ex. J59, § 4.10(a).  The "Confidential Information" included RxSport's "trade secrets" and "methods and procedures."  *Id.*

RxSport ultimately defaulted on the loan and elected to file for bankruptcy in January 2019.  Vol. 1, 202:16–203:1; Vol. 6, 69:6–15; Ex. J61.  To resolve the default bankruptcy proceeding, RxSport executed an "Acknowledgement and Consent" in which RxSport agreed to transfer all the collateral to La Potencia.  Ex. J61; Vol. 6, 145:23–146:9.  Specifically, pursuant to the Security Agreement, RxSport agreed to transfer the entirety of the collateral, which included, among other things, "(b) All Accounts, including the Receivables," "(e) **all General Intangibles . . . Trademarks, Tradenames, Know-how; trade secrets, and Formulas**"; and (f) all Goods (including Inventory, Equipment and Fixtures[)]"  *Id.* (emphasis added).[3]  David Chandler confirmed at the Hearing that the bankruptcy was resolved through this arrangement, testifying "Yes, everything was handed over to fulfill the obligation of the loan."  Vol. 6, 69:11–16.  David Chandler testified that the CHANDLER BATS mark and the Chandler Bats Logo were transferred to La Potencia and that "formulas" included "how you mix finishes," further stating "Again, [La Potencia] had everything."  Vol. 6, 146:24–147:25; 148:5–7.

Following the transfer of Collateral from RxSport to La Potencia, La Potencia transferred the physical assets of the Chandler Bats business to YC52.  Ex. J52; Vol. 1, 88:17–23; 205:9–10.

---

[3]  "Trademarks" was defined in the Security Agreement to mean "(a) all trademarks, service marks, trade names, corporate names, company names . . . other source or business identifiers . . . (b) all goodwill associated therewith or symbolized thereby and (c) all other similar assets, rights and interests that uniquely reflect or embody such goodwill."  Ex. J60, § 1.7.  The Court, in granting Plaintiffs' and Third-Party Defendants' Motions to Dismiss Amended Counterclaims ("Order on Motion to Dismiss"), [ECF No. 276], held that the Loan Agreement transferred the trademarks and trade secrets to La Potencia.  Order on Mot. at 9–10.

La Potencia also licensed its intellectual property, including trade secrets, to YC52. Ex. J30; Ex. J62. Pursuant to the subject License Agreement, YC52 is the licensee of the CHANDLER BATS mark and Chandler Bats Logo, as well as the trade secrets and formulas for manufacturing Chandler Bats.[4] Ex. J30.

### IV. Plaintiffs' Bat Coating and Finish Formula

Plaintiffs now use the coating and finish process that David Chander developed, which consists of the following layers:



While operating RxSport, David Chandler adjusted the suppliers of these ingredients. Vol. 6, 150:14–152:20, 36:17–22 ▮▮▮▮▮ Ex. J19; 149:14–150:13 ▮▮▮▮▮



▮▮▮▮▮ Vol. 3, 58:4–24, Ex. J19 ▮▮▮▮▮ Vol. 6, 154:19–155:14 ▮▮▮▮▮ Now, Plaintiffs and Group Authentic procure the components from those same manufacturers that David Chandler selected when he developed the formula: ▮▮▮▮▮

---

[4] YC52 is also the licensee of the "CHANDLER" mark but currently only holds common law trademark rights in that mark and not a federal registration. Vol. 1, 109:25–110:22. RxSport used the "CHANDLER" mark prior to the transfer of assets to La Potencia, indicating that mark was transferred to La Potencia in addition to the CHANDLER BATS mark and Chandler Bats Logo. Vol. 1, 111:1–113:4; 113:8–24; 118:2–119:7; 124:2–125:12; Exs. J29, P17, J28.



Exs. J19, J25; Vol. 3, 47:24–48:9, 35:14–22, 36:17–22, 54:1-8; 58:4–24, 60:18–22, 64:25–65:16; Vol. 6, 204:4–14. ████ ████████ Vol. 6, 20:20–21, 153:17–21, 154:19–24.

Plaintiffs' rebuttal coating expert, John Fisher, who worked as a chemist for over 40 years developing ████, testified that there could be an infinite amount of end-product of ████████████ depending on the inputs. Fisher Tr., 7:18–17:8; 10:1–21; 12:22–13:7; 18:5–9.[5] Changing the formula or starting materials ████████ changes the properties and performance, including facets such as tensile strength, elongation, modulus, hardness, and glass transition temperature. *Id.* at 29:3-30:24; 32:7-33:11.

A. **Plaintiffs' Alleged Trade Secrets**

Plaintiffs claim trade secret protection in a combination of any of the ████ that comprise the formula, <u>along with the specific ingredients that Plaintiffs use</u>. Specifically, Plaintiffs claim trade secret protection in each of the following:



---

[5] The Court permitted the Parties to conduct depositions of experts Dr. Nejad and John Fisher following the preliminary injunction Hearing. *See* [ECF No. 169]



Vol. 3, 36:23–37:15; 39:14–16; 57:17–21; 58:25–59:8; 60:18–22.  Plaintiffs **do not** claim trade secrets in the following processes or ingredients:

- ███████████, Vol. 3, 46:14–16;

- "Boning," Vol. 3, 32:4–9; 122:4–16;

- ██████, Vol. 3, 70:7–9; and

- ████████████████████████████ *See* Plaintiffs' PFFCL at 14.

## B.  Public Knowledge of ████████ and Finishing Components

████████████████████ mixing its components the same way that Plaintiffs mix their "E" finishes. Vol. 6, 142:4–16.  And MaxBat manufactures Group Authentic's bats, in part, by following the manufacturers' specifications.  Vol. 7, 32:2–36:22.  The manufacturer of the ████ ████████████████████████ publicly advertises the product as providing "a uniform and easily reproducible texture effect with a medium surface texture" especially recommended for wood coatings.  Ex. D113; Vol. 4, 181:4–182:17.  Plaintiffs have no nondisclosure agreements with ████████████████████████████████████ ████████████████████ Vol. 3, 113:3–7.

## C.  Methods of Maintaining Confidentiality

Plaintiffs have identified that their bat-making formula—and entire manufacturing process—are subject to multiple layers of security to prevent the public from gleaning the trade secrets.  For one, the formula is written in one document, kept off-site in a vault.  Vol. 3, 6:9–11;

23:11–25:23.  Benjamin Chase, YC52's CEO, testified that YC52's facility has a gated entry with cameras both inside and outside that are constantly monitored and recorded.  Vol. 3, 6:4–9:22; Vol. 1, 85:6–10.  The doors to the facility are always locked and YC52 does not allow visitors.  *Id.*  YC52 does not have a retail presence at the facility.  *Id.*  In the limited cases where a professional player wants to come to the facility to work on his specific bat model, Plaintiffs implement certain procedures to keep that player from being exposed to confidential information, such as a no-phone policy and no manufacturing while the player is present.  *Id.*  Different stages of the manufacturing process are compartmentalized by location and with specialized personnel, trained on a need-to-know basis; for instance, at YC52, the bats are painted and finished in a "room within a room," referred to as the paint booth.  Vol. 2, 14:24–16:11; Vol. 1, 91:6–13, 93:13–94:1; Vol. 3, 6:4–9:22, 34:16–21.

Notably, beginning at RxSport and continuing under YC52, brand/product labels for certain ingredients are removed from containers and relabeled with colors or "A" and "B"—the meanings of which are known only to certain employees.  Vol. 2, 14:12–23; 73:3–15, 76:23–77:11.  Cesar Calleja, who worked for David Chandler at RxSport, ripped labels off product cans at David Chandler's direction.  Vol. 2, 73:3–15, 75:15–17.  At RxSport, only David Chandler ordered materials for ███████ or painting supplies. Vol. 2, 61:2–7.  At YC52, the ordering process for these materials is delegated to two key employees, Garrik Napier and Calleja, neither of whom knows the ordering process of the others' assigned products.  Vol. 3, 6:4–9:22.

Calleja is responsible for ordering ████████████████████ ████████ Vol. 2, 63:17–64:21. Those products are delivered to the "paint door" of the facility.  *Id.*  Upon receipt of those products, Calleja immediately removes the labels and replaces them with different colors of tape.  *Id.*  Napier orders ████████████████████ and then brings them to the facility, where they are placed in Calleja's locked office.  Vol. 2, 12:23–14:10,

64:22–65:25.  Calleja then removes the labels and pours ██████████████████ without labels, marking them "A" and "B."  *Id.*

All YC52 employees are required to sign confidentiality and non-disclosure agreements.  Vol. 3, 6:21–22; 9:20–22; *see also* Exs. J7, J8, J9, J10, J11, J12, J13, J14, J64, J66, J70, P7.  Nevertheless, only one or two employees are actually exposed to the full bat-making process.  Vol. 2, 66:6–67:3.  All employees at RxSport had also signed nondisclosure agreements.  Vol. 2, 75:15–17.

The parties were permitted to submit data from David Chandler's iPhone with their Supplemental Briefing, pursuant to the Court's Post Hearing Scheduling Order.  *See* [ECF No. 169].  The Court finds the following messages, alongside testimony presented at the Hearing, relevant to RxSport/David Chandler maintaining secrecy in the bat-making process:

a. A third party asked David Chandler, "So is your process much diff from what LS does?  Is it just tighter tolerances, better raw materials?  I know there is a How It Is Made for theirs[,]" and David Chandler responded, "It's those things and more technology between steps.  A few secrets that I won't even patent."  *See* [ECF Nos. 229-8, 229-9].

b. In discussing confidentiality agreements, David Chandler stated: "My staff signs their lives away."  *Id.*

c. David Chandler subsequently wrote, "Please keep the finish technology under wraps.  I can put faith in you as a good measure but I trust no one."  The third party responded: "That's what the NDA is for, yes?  Sent it to legal.  Not sure who will have to sign it.  Usually a Div. GM."  *Id.*

d. David Chandler then stated: "and yes, the NDA/CA helps create a bit of warm and fuzzy feeling, but I simply wanted to reiterate it, as well.  Companies have been trying

to figure out what the heck I'm doing for a while and they can't reverse engineer it too well, one little slip and I'll loose [sic] my stronghold and edge." *Id.*

### D. Defendants' Bat Making

After the transfer of assets to La Potencia in July 2019, YC52 hired David Chandler, where he worked until October 2019. Vol. 1, 205:11–24. David Chandler then formed Group Authentic to begin selling baseball bats, alongside MaxBat as the manufacturer. Vol. 6, 77:3–78:3, 114:5–6. David Chandler began training MaxBat employees on preparing bats—introducing MaxBat to ███████████████████████████████ that RxSport and now Plaintiffs use. Vol. 7, 54:21–55:10; Vol. 6, 192:20–194:2. Following the visits to MaxBat, David Chandler created a 12-page written flowchart with the ingredients and instructions for the Chandler Bats coating/finish formula and sent it to MaxBat in January 2022 as a reference guide. Vol. 7, 56:15–57:17; Vol. 6, 197:2–199:3, 200:19–24, 202:13–15; Exs. J21, J22, J23. Group Authentic first started taking orders for sales of its bats that MaxBat manufactured in early 2022. Vol. 6, 78:4–14. Plaintiffs learned that Group Authentic was selling bats soon after. Vol. 1, 210:11–211:9.

Group Authentic uses the same ingredients (and suppliers) as set forth in the formula David Chandler developed at RxSport ███████████████ Group Authentic bats are made with ███ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Ex. J24; *see also* Vol. 6, 204:4–14. However, there are differences in ratios of ingredients and application techniques. ████████ ████████████████████████████████████████████████████████████ ██████████ *Compare* Ex. P14 at 5 ¶ 2(b) *with* Ex. J22 at GADC000004. █████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████ *Compare* Ex. P14 at 6, ¶ 4(a) *with* Ex. J22 at GADC000004. ████████ █████████ ████████ ████ █ ████ ██ ████████



so these formulas and application techniques are not the same. *Compare* Ex. P14 at 6 ¶ 5(a) *with* Ex. J22 at GADC000004.

so these formulas and application techniques are not the same. *Compare* Ex. P14 at 6 ¶ 6(a) *with* Ex. J22 at GADC000004.

Vol. 7, 35:8–36:23. Lastly, Group Authentic's and MaxBat's are different from Plaintiffs'

. Ex. J24 at 5 ¶ 5(b); Vol. 3, 70:7–20.

### E. MaxBat

Paul Johnson, MaxBat's representative, testified that David Chandler provided MaxBat the "flowchart" of the bat-making formula and process as well as safety data sheets. Vol. 7, 23:20–22, 59:17–60:19; Exs. J22, J23. Johnson explained that he later located , and the directions matched how the flowchart applied the finishes. *Id.* at 32:2–34:1. However, Johnson also testified that, even if MaxBat had learned that Chandler Bats

*Id.* at 60:20–24. And despite examining a Chandler bat to replicate the glossy high-built finish and having been informed that MaxBat had not been able to reverse engineer the bat to replicate the finish. *Id.* at 45:3–46:5. MaxBat has begun using at least on all its pro-level bats, which are now sold at Dick's Sporting Goods. *Id.* at 44:13–18, 61:2–6, 68:1–5, 70:15–17. MaxBat only uses not on bats finished with the old coating. *Id.* at

68:6–9.  MaxBat now orders ████████████████████████████████████

████████████████, using these supplies on the MaxBat bats as well as the Group Authentic

bats it manufactures.  *Id.* at 65:24–67:7.

## V.  Chandler Trademarks

### A.  Defendants' "Authentic by David Chandler" Trademark

Group Authentic's bats are branded with the logo "Authentic by David Chandler."  Vol. 6,

176:12–14.

### B.  Alleged Evidence of Confusion by "Authentic by David Chandler" Mark

At the Hearing, as well as in deposition testimony submitted into evidence after the

Hearing, Plaintiffs provided examples of what they claimed were instances of confusion between

the Chandler marks and Defendants' use of the mark "Authentic by David Chandler."  Those

instances include the following:

a.  On January 20, 2023, a customer contacted YC52 about ordering an Authentic by

David Chandler bat, attaching pictures of an Authentic by David Chandler bat.  Ex.

J23.

b.  Josh Morgan, a minor league player for the Seattle Mariners who has used both

Chandler Bats and Defendants' bats testified: "There was when I did my first bat fitting

in 2022 because I had never heard of Authentic Chandler, so I thought it might have

been the same thing."  Morgan Tr., [ECF No. 228-38] at 23:10–16. And when asked

about his agent mistakenly ordering Chandler Bats in January 2023 when Josh Morgan

intended to order Defendants' bats, Josh Morgan testified: "Well, I said to my agent

that I was ordering Authentic Chandler, which I thought that was what the bat company

was named, Authentic Chandler; and it just must have been a misunderstanding."  *Id.*

at 19:7–19 (emphasis added); *see also* Ex. J15.  He also stated in a text message: "I

want these bats by Authentic Chandler, I think it's like the new version of the original Chandler." *Id.* at 24:20–25:17; Ex. J15.

c. On October 31, 2022, Chandler Bats received an inquiry from a potential customer about ordering "'authentics' chandler bats." Vol. 2, 137:25–138:21; Ex. P12. The potential customer further asked: "What is authentics? Does that mean it does not come with the chandler logo? Are they really made by your company or are they fake? Are they lesser quality?" *Id.*

d. On June 6, 2022, a prior Chandler Bats customer emailed YC52: "Are your Authentic Chandler bats a lower grade model from your standard Chandler bats?" Vol. 2, 121:20–123:23; Ex. P9.

e. As of January 2023, sidelineswap.com, a third-party site for reselling bats, listed an Authentic by David Chandler bat under a search for "Chandler." Vol. 2, 112:10–114:8. Multiple Chandler Bats were also listed under that search. *Id.*

f. As of January 2023, Play It Again Sports listed multiple Authentic by David Chandler bats each as a "CHANDLER MODEL." Vol. 2, 116:16–119:1; Ex. J18.

g. On March 23, 2022, Dan O'Rourke, the equipment manager for the Philadelphia Phillies, sent a baseball bat to Garrik Napier at YC52, intended for Group Authentic. Vol. 2, 19:1–16; 24:7–25:13; Ex. J63. O'Rourke acknowledged that he shipped the bat to the wrong location. O'Rourke Tr. 22:8–18. Specifically, he addressed the bat to Garrik Napier of Chandler Bats and shipped the bat to the Chandler Bats' facility in Port St. Lucie.

h. Michael Olt, previously a sales manager at YC52, testified that he visited the Colorado Rockies' clubhouse around March 2022 where the manager was initially confused why he had returned to sell bats just a few days later. Olt realized the Rockies' clubhouse

manager believed David Chandler's team—that had been there about two days prior—were selling Chandler Bats.  Vol. 2, 81:12–24; 83:7–14; Vol. 2, 87:24–88:4.

i.   Justin Best, an amateur player and Chandler Bats customer, posted an image on Instagram of himself holding an Authentic by David Chandler bat but instead tagged Chandler Bats.  Vol. 2, 127:15–130:15; Ex. P10.

j.   In 2022, an agent sent a text message to a YC52 employee that stated: "Hey what's this I hear you guys are changing bat names to 'authentic.'"  Ex. P13.

Defendants retained an expert, Rhonda Harper, who conducted a survey and provided an expert report on likelihood of confusion, Ex. D52, and secondary meaning, Ex. D48.  Harper testified that she conducted her survey based on the Chandler Bats Logo but did not conduct a likelihood of confusion analysis between the CHANDLER BATS mark and the "Authentic by David Chandler" mark.  Vol. 5, 25:20–26:3,171:5–11.  Harper's survey was limited to retail customers (98% of the universe) and did not screen for whether participants were staff for professional teams or professional players themselves.  Vol. 5, 148:18–22, 150:13–17.  As a result, the universe did not include professional players.  *Id.*; Ex. P48 at 28; Vol. 8, 40:2–15.  Harper was not provided the percentage of sales to professional baseball players prior to determining the universe and conducting the survey.  Vol. 5, 132:23–134:15.  Again, a significant portion of Chandler Bats' primary customers are professional baseball players.  Vol. 1, 139:18–140:6; Vol. 8, 107:2–25.

Harper reported a 2.5% net likelihood of confusion among the 413 participants as to the source or affiliation or approval of "Authentic by David Chandler" as coming from Chandler Bats.  Ex. D52 at 31.  The report found that one-third of respondents—parents or guardians of a child 13 to 22—were unable to distinguish well-known wood baseball bat brands from the mark at issue (Authentic by David Chandler) and also could not distinguish well-known brands from fictional

marks ("AUTHENTIC BY JAMES DRELNACH").  Vol. 8, 88:25–98:15; Ex. P48 at 31–33; Vol. 5, 181:4–183:8; Ex. D52 at 33 (Fig. 6).  In a secondary meaning study, a critical factor is measuring the extent to which a particular mark is associated with a single source in the minds of the relevant group of consumers. Vol. 8, 32:16–19; Vol. 5, 78:13–19.  Harper found that 11% of respondents participating in the secondary meaning survey identified Chandler Bats with only one source, thereby concluding that the Chandler Bats mark has not acquired a secondary meaning in the minds of relevant consumers.  Ex. D48; Vol. 5, 89:1–25.

### C. Secondary Meaning to the Consuming Public

Defendants contend that Plaintiffs must establish the CHANDLER BATS mark has acquired secondary meaning to be enforceable.  While the Court will discuss this contention below, the following facts, in addition to the actual confusion identified above, are relevant to establishing secondary meaning:

a. Edward Paparella is a hitting strategist with the Seattle Mariners minor league program who oversees approximately 80 to 100 players.  Paparella Tr., 5:22–6:7; 30:9–20.  When asked about the most popular brands of his players' bats, he responded: "I would say Louisville, Birdman—Louisville Birdman. Some guys swing Chandler and Old Hickory.  I would say those are the big ones that a lot of guys use." *Id.* at 30:21–31:3.  He confirmed that he meant Chandler Bats when he said "Chandler." *Id.* at 31:4–7.  He also testified that he thought the Chandler bat he previously swung was "great quality." *Id.* at 31:15–32:1.

b. Dan O'Rourke, the equipment manager for the Philadelphia Phillies responsible for purchasing bats for players, testified that there are only five to six bat companies that players typically use, including Chandler Bats.  O'Rourke Tr., 7:11–15; 7:23–25; 21:2– 19.

c.  Benjamin Chase, YC52's CEO, explained that Chandler Bats was one of the top four bat manufacturers in 2023 in terms of market share to MLB players.  Vol. 1, 160:1–18. As of July 2023, Chandler Bats held approximately 11% of the market share of MLB players.  *Id.*  Chandler Bats has remained one of the top five baseball bat manufacturers among professional players for the past several years.  *Id.*

d.  Garrik Napier worked for Louisville Slugger for nearly 13 years as the pro-bats coordinator until approximately 2020.  Vol. 2, 8:16–10:4.  He oversaw production of all orders going to major and minor league baseball players.  *Id.*  While at Louisville Slugger, Mr. Napier was familiar with the Chandler Bats reputation in the industry and testified that Chandler Bats was well-known amongst professional baseball players.  *Id.*

Chandler Bats conducts marketing and promotion with players and agents through clubhouse visits and at spring training.  *Id.* at 141:23–142:14.  Chandler Bats also runs event-related marketing, online marketing, email marketing, promotion and advertising through its website, affiliate marketing, pay per click advertising, social media advertising, and Google ad words and shopping.  *Id.* at 144:12–146:25, 150:3–12.  Chandler Bats has invested funds in advertising with Dick's Sporting Goods.  *Id.* at 197:1–10; 199:4–14; Ex. P25.  It also advertises at various sporting events and runs social media advertisement campaigns.  *Id.* at 199:18–200:13, 201:6–15; Ex. P27; Ex. J51.  Chandler Bats spends approximately 5–10% of its revenue on marketing and advertising, not including salaries for its sales team.  *Id.* at 145:16–146:25.

### D.  Pecos League and Bestbatdeals.com.

Pecos League (doing business as Bestbatdeals.com) sells and distributes Group Authentic's bats. Vol. 1, 221:4–13. Bestbatdeals.com previously sold Chandler Bats but stopped selling Chandler Bats around the time it began selling the Authentic by David Chandler bats. Vol. 1, 221:20–224:18.

## LEGAL STANDARD

"A district court may issue a preliminary injunction where the moving party demonstrates (1) a substantial likelihood of success on the merits;[6] (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Id.* (citation omitted).

Here, Plaintiffs have moved for a preliminary injunction regarding the infringement of their trademarks under the Lanham Act and misappropriation of their trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836.[7] The Court addresses the likelihood of success on the merits on the trademark issue first, finding the Chandler Marks are valid and enforceable; Plaintiffs have demonstrated that Chandler Bats has assumed a secondary meaning; and that a likelihood of confusion exists between Plaintiffs' marks and Authentic by David Chandler. On deck is the Court's analysis of the trade secret claim. The Court finds that parts of Plaintiffs' bat-making formula are subject to trade secret protection and that Defendants have misappropriated

---

[6] *See Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021) (clarifying that "a plaintiff must demonstrate that its claim has some likelihood of success on the merits, not merely a better than negligible chance"); *Humana, Inc. v. Cushing*, No. 20-61379, 2020 WL 5100061, at *4 (S.D. Fla. July 30, 2020) (interpreting *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223 (11th Cir. 2005) and finding that the Eleventh Circuit's standard for likelihood of success on the merits is whether a plaintiff can show it is "likely or probable" to prevail at trial).

[7] Preliminary injunctions are proper on trade secret claims under the Federal Defend Trade Secrets Act. *Int'l Markets Live, Inc. v. Huss*, No. 20-23080, 2020 WL 9219150, at *10 (S.D. Fla. Nov. 25, 2020), *report and recommendation adopted*, *Int'l Markets Live, Inc. v. Huss*, No. 20-23080, 2021 WL 870535 (S.D. Fla. Mar. 9, 2021). And the Lanham Act specifically authorizes the entry of a preliminary injunction for trademark infringement. *See* 15 U.S.C. § 1116.

such trade secrets.  And the Court does not find Defendants' defenses of fair use or reverse engineering sufficiently compelling to rebut Plaintiffs' likelihood of success on either claim.

The Court further finds that Plaintiff will suffer irreparable injury unless the injunction issues; the threatened injury to Plaintiff outweighs the damage the proposed injunction causes; and issuing the injunction is in favor of the public interest.  Balancing these factors, the Court concludes that the record evidence warrants the issuance of a preliminary injunction.

## CONCLUSIONS OF LAW

**I.  Plaintiffs have demonstrated a likelihood of success on the merits as to their trademark infringement claim.**

At bat is whether Plaintiffs have sufficiently demonstrated that Group Authentic's "Authentic by David Chandler" trademark infringes on La Potencia's Chandler marks, notwithstanding Defendants' fair use claim.  To prevail on a trademark infringement claim, a plaintiff must demonstrate (1) that they "own [] a valid and enforceable trademark"; (2) Defendants "used the trademark in commerce without consent," and (3) "'that the unauthorized use was likely to deceive, cause confusion, or result in mistake.'" *Edge Systems LLC v. Aguila*, 186 F. Supp. 3d 1330, 1348 (S.D. Fla. 2016) (quoting *Davidoff & CIE, S.A. v. PLD Intern. Corp.*, 263 F.3d 1297, 1301 (11th Cir. 2001)); *see also* 15 U.S.C. § 1114.  Despite Defendants' contentions, the Court finds that La Potencia owns the trademarks at issue and further addresses the fact-specific nature of trademark infringement based on one's own surname.

### A.  The trademarks are valid and enforceable.

The Court has already rejected Defendants' argument that Plaintiffs do not own the Chandler trademarks.  The trademarks, pursuant to the terms of the Loan Agreement and letter transferring the collateral to La Potencia, are held by Plaintiffs.  Under the Loan Agreement, the "Collateral" transferred to La Potencia included "All Accounts, including the Receivables, . . . all

General Intangible . . . Trademarks," "Tradenames," "Know-how," "trade secrets," and "Formulas," which included RxSport's "Chandler Bats", "Chandler", and "RxSport" trademarks and tradenames. *See* Omnibus Order Granting Plaintiffs' and Third-Party Defendants' Motion to Dismiss Amended Counterclaims, [ECF No. 276] at 9–10. "Trademarks" was also defined to include "(a) all trademarks, service marks, trade names, corporate names, company names . . . other source or business identifiers . . . (b) all goodwill associated therewith or symbolized thereby and (c) all other similar assets, rights and interests that uniquely reflect or embody such goodwill." Ex. J60, § 1.7.

"When a business purchases trademarks and goodwill, the essence of what it pays for is the right to inform the public that it is in possession of the special experience and skill symbolized by the name of the original concern, and of the sole authority to market its products." *Levitt Corp. v. Levitt*, 593 F.2d 463, 468 (2d Cir. 1979). Thus, where "the infringing party has previously sold his business, including use of his name and its goodwill, to the plaintiff, sweeping injunctive relief is more tolerable." *Id.* That is because "[t]he value of goodwill obviously becomes diluted and sales lost if confusion arises in the mind of the public over the source of the reputable goods or services." *Id.* "To protect the property interest of the purchaser, then, the courts will be especially alert to foreclose attempts by the seller to 'keep for himself the essential thing he sold, and also keep the price he got for it.'" *Id.* (quoting *Guth v. Guth Chocolate Co.*, 224 F. 932, 934 (4th Cir. 1915)). "And if the district court finds that the seller has attempted to arrogate to himself the trade reputation for which he received valuable consideration, broad remedies may be effected to restore to the plaintiff the value of his purchase." *Id.*

To resolve the bankruptcy proceeding, the CHANDLER BATS Mark, Chandler Bats Logo and Chandler Bats business were transferred to Plaintiffs in July 2019.[8]  Where "a mark has been registered with the USPTO, there is a rebuttable presumption that the mark [] [is] protectable or distinctive." *Royal Palm Props., LLC v. Pink Palm Props, LLC*, 950 F.3d 776, 783 (11th Cir. 2020) (citation omitted) (alterations in original); *see also* 15 U.S.C. § 1115 ("Any registration . . . of a mark registered on the principal register provided by this chapter and owned by a party to an action . . . shall be prima facie evidence of the validity of the registered mark and of the registration of the mark").

The Chandler Bats Logo is registered on the principal register (U.S. Trademark Registration No. 4,542,834).  Thus, there is a rebuttal presumption that the mark is valid. Defendants do not appear to have challenged the validity of the Chandler Bats Logo nor have they presented evidence to overcome the presumption of validity.  Thus, the Court finds that the Chandler Bats Logo is valid and enforceable.  However, Defendants have challenged whether the CHANDLER BATS mark has acquired secondary meaning, thereby warranting trademark protection.  The Court finds that the CHANDLER BATS mark has acquired secondary meaning, as outlined below.

### 1. The CHANDLER BATS mark has acquired secondary meaning.

Defendants have challenged the validity of the CHANDLER BATS mark.  Specifically, they contend that U.S. Trademark Registration No. 4,503,473 is on the supplemental register, not the principal register, and does not carry the same rebuttable presumption of validity.  And because

---

[8]  *See Rossi Ventures, Inc. v. Pasquini,* No. 11-CV-02838-CMA-BNB, 2012 WL 2503050, at *9 (D. Colo. Apr. 9, 2012), *report and recommendation adopted*, No. 11-CV-02838-CMA-BNB, 2012 WL 2501083 (D. Colo. June 28, 2012) (granting preliminary injunction and finding that "the view that everyone has an 'absolute' or 'sacred right' to use one's own personal name as a mark has been uniformly rejected." (citation omitted)).

the mark is "descriptive" and based on the "Chandler" surname, Defendants argue that the CHANDLER BATS mark must have acquired secondary meaning for it to be valid.

To be enforceable, a trademark must be "distinctive"—a mark that identifies the source of the goods or services. *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 950 F.3d 776, 782 (11th Cir. 2020). Marks that are not "inherently distinctive"—and hence descriptive—can "acquire" distinctiveness by obtaining "secondary meaning." *Id.* at 782–83; *see also Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1522–23 (11th Cir. 1991) ("[I]f the personal name mark acquires secondary meaning, it is afforded the strength of an inherently distinctive mark"). Marks that are surnames are those that acquire distinctiveness by obtaining secondary meaning. *See, e.g., Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1513 (11th Cir. 1984). "A mark obtains a secondary meaning—and therefore acquires distinctiveness—when, in the minds of the *relevant consuming public*, the 'primary significance of the term . . . is not the product but the producer.'" *Royal Palm*, 950 F.3d at 784 (emphasis added). Significantly, "[w]hen a product is 'targeted at only a specific segment of the general public,' the relevant consuming public consists only of those targeted consumers—not the public at large." *Id.* at 784 n.3 (finding the relevant consuming public to consist of those interested in buying or selling a home in the country club at issue) (quoting 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 15:27 (5th ed. 2019) (hereinafter "*McCarthy*")).

The Eleventh Circuit has stated that "[s]econdary meaning can be proven . . . through either direct evidence (like consumer surveys) or circumstantial evidence." *Royal Palm*, 950 F.3d at 784. For circumstantial evidence, courts consider four factors in determining whether a mark has acquired secondary meaning: "(1) the length and manner of [the mark's] use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the [proprietor] to promote a conscious connection in the public's mind between the [mark] and the [proprietor's] product or business; and

(4) the extent to which the public actually identifies the [mark] with the [proprietor's] product or venture." *Id.* at 785 (brackets in original); *see also Conagra,* 743 F.2d at 1513. "Secondary meaning does not require proof that consumers know the name of the company that owns the trademark.  It requires only that customers associate the word or symbol with a single, albeit anonymous, commercial source." 2 *McCarthy* § 15.1; s*ee also TracFone Wireless, Inc. v. Anadisk, LLC,* 685 F. Supp. 2d 1304, 1311 (S.D. Fla. 2010) (finding secondary meaning where plaintiff's "Marks are well known and established to customers and the trade as symbols identifying and distinguishing [plaintiff's] products and services.").

Plaintiffs have presented sufficient circumstantial evidence demonstrating that the CHANDLER BATS mark has acquired secondary meaning.  First, as to the length and manner of use, the Eleventh Circuit has found even only two years of use to be sufficient for acquiring secondary meaning, noting that "the time necessary to acquire secondary meaning 'may be quite short.'"  *FN Herstal SA v. Clyde Armory, Inc.*, 838 F.3d 1071, 1084 (11th Cir. 2016).  Here, RxSport and now Plaintiffs have been using the CHANDLER BATS mark in connection with the sale of all their bats since 2010; no evidence has been presented of any third party using the CHANDLER BATS mark or that the mark has been abandoned.

For advertising and promotion, "the question is not the extent of the promotional efforts, but their effectiveness in altering the meaning of [the word] to the consuming public."  *Id.* at 1085 (internal quotation marks omitted) (quoting *Aloe Creme Labs., Inc. v. Milsan, Inc*., 423 F.2d 845, 850 (5th Cir. 1970)).  While RxSport operated Chandler Bats, David Chandler promoted the brand through interviews with Fox Business Network, NBC Sports, and MSNBC—highlighting MLB players using Chandler Bats.  Chandler Bats interacts with players and agents through clubhouse visits and at spring training.  Chandler Bats also engages in substantial marketing and promotion of its brand by advertising with Dick's Sporting Goods and at various sporting events; empirically,

Chandler Bats spends approximately 5–10% of its revenue on marketing and advertising. The marketing and promotional efforts by RxSport and Plaintiffs to build the Chandler Bats brand has appeared effective in altering the meaning of the CHANDLER BATS mark to the consuming public to refer to RxSport's—and now YC52's—bats.

Further, YC52's CEO, Benjamin Chase, testified that Chandler Bats has consistently been one of the top five bat manufacturers in terms of market share to MLB players for several years, holding approximately 11% of the market share of MLB players. And, professional baseball players and coaches' testimony reflects a conscious connection between the mark and the bat. *See Connecticut Cmty. Bank v. The Bank of Greenwich*, 578 F. Supp. 2d 405, 414–15 (D. Conn. 2008) (analyzing market share growth as a factor in favor of finding secondary meaning); *Beacon Mut. Ins. Co. v. OneBeacon Ins. Corp.*, 376 F. Supp. 2d 251, 259 (D.R.I. 2005) (finding large market share, length of use, and promotional efforts provided a reasonable inference that a significant percentage of Rhode Islanders were familiar with the Beacon name and logo, associating it with a specific source for workers' compensation insurance). Here, the evidence supports the conclusion that the owners of the mark have expended considerable effort in establishing a connection between the Chandler Bats name and the bat business—and the relevant consuming public identifies the name Chandler Bats. *Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 189–90 (11th Cir. 2005) (entitling trademark protection to a mark because it acquired secondary meaning, in part because of the great effort the owners expended in establishing a connection between the "Barrow" name and the propane business—where the mark had appeared throughout the company's office signs, trucks, propane tanks, employee uniforms, customer invoices, and advertising materials).

Further, while the Court has found evidence of secondary meaning through circumstantial evidence, Plaintiffs have also provided evidence of actual confusion, which can constitute direct

evidence of secondary meaning. *Popular Bank of Florida v. Banco Popular de Puerto Rico,* 9 F. Supp. 2d 1347, 1358 (S.D. Fla. 1998); *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC,* 605 F.3d 931, 939 n.36 (11th Cir. 2010). Specifically, "'if buyers are confused, then this also means that they must have recognized plaintiff's word as a trademark and associated it only with plaintiff.'" *Id.* (citing 2 *McCarthy* § 15:11).

Here, Plaintiffs have introduced evidence of several instances of actual customer confusion. The Court will expand on said evidence below, when analyzing the next prong of the test for trademark infringement—that the unauthorized use was likely to deceive, cause confusion, or result in mistake. This evidence provides further proof that the CHANDLER BATS mark has acquired secondary meaning.[9] Thus, given the presence of both circumstantial and actual evidence, the Court finds that Plaintiffs have established the CHANDLER BATS mark has acquired secondary meaning and is thus valid and enforceable.

### B. Plaintiffs have established a likelihood of confusion.

The Eleventh Circuit weighs the following seven factors in assessing whether a likelihood of confusion exists: "(1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and defendant; (4) the similarity of the sales methods; (5) the similarity of advertising methods; (6) the defendant's intent, e.g., does the defendant hope to gain competitive advantage by associating his product with the plaintiff's established mark; and (7) actual confusion." *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1220 (11th Cir. 2008) (internal quotation marks omitted) (quoting *Alliance Metals, Inc., of Atlanta v. Hinely*

---

[9] To be sure, Defendants have attempted to rebut the existence of secondary meaning by providing survey evidence. However, as explained below, said evidence is unpersuasive and unnecessary given the presence of both circumstantial and actual confusion.

*Indus., Inc.,* 222 F.3d 895, 907 (11th Cir. 2000)).  The district court "does not have to consider all of these factors in every case."  *Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Florida Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, The Ecumenical Order*, 809 F.3d 1171, 1181 (11th Cir. 2015).  Indeed, the Eleventh Circuit notes that, out of all these factors, the strength of the mark and actual confusion are the most probative.  *PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1165 (11th Cir. 2019).

The Eleventh Circuit has consistently found that, while evidence of actual confusion is unnecessary to establish likelihood of confusion, evidence of actual confusion is the "best evidence" of a likelihood of confusion.  *Sovereign Military*, 809 F.3d at 1189; *Frehling Enterprises, Inc. v. Intern'l. Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999) ("It is undisputed that evidence of actual confusion is the best evidence of a likelihood of confusion."); *Wreal, LLC v. Amazon.com, Inc.,* 38 F.4th 114, 137 (11th Cir. 2022).  The Court proceeds to address each of the seven factors.

### 1. *Strength of Plaintiffs' Marks*

There are four categories of strength of a mark: "(1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary."  *Frehling*, 192 F.3d at 1335.  "A descriptive mark describes a characteristic or quality of the product or service, such as its intended use, its ingredients, its dimensions, its desirable features, or its end effect on the consumer."  *Id.*  "If the mark is merely descriptive, such as a personal or surname, its strength depends on whether it has acquired secondary meaning."  *Tana v. Dantanna's*, 611 F.3d 767, 776 (11th Cir. 2010); *see also Conagra*, 743 F.2d at 1513 (requiring a showing of secondary meaning for a surname to give rise to enforceable trademark rights).

As explained above, the CHANDLER BATS mark has acquired secondary meaning for relevant consumers, signifying that the mark is distinctive. The Chandler Bats Logo—comprised of a large "C" with a cursive "Chandler" within the "C"—is similarly distinctive. Accordingly, the Court finds the marks, used in connection with commercializing bats, to be strong.

### 2. Similarity of the Marks

In assessing the second factor, "the court compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Frehling*, 192 F.3d at 1335. Similarity in any of these elements may be sufficient to find the marks similar. *Wreal*, 38 F.4th at 130 (citing *Stone Lion Cap. Partners, L.P. v. Lion Capital LLP*, 746 F.3d 1317, 1321 (Fed. Cir. 2014)). The distinctive aspect of Defendants' "Authentic by David Chandler" mark is the use of the Chandler surname, identical to Plaintiffs' CHANDLER BATS mark and the Chandler Bats logo. *See Conagra*, 743 F.2d at 1514.

The marks are examined in their entirety rather than simply comparing the similar terms or dominant features. *See Michael Caruso & Co., Inc. v. Estefan Enters., Inc.*, 994 F. Supp. 1454, 1460 (S.D. Fla. 1998). Here, Defendants' addition of the term "Authentic" is insufficient to distinguish the overall mark from the impression generated by the "Chandler" portion of the mark. *See, e.g., In re Detroit Athletic Co.*, 903 F.3d 1297, 1303–04 (Fed. Cir. 2018) (affirming the Trademark Trial and Appeal Board's ("TTAB") finding that the marks DETROIT ATHLETIC CO. and DETROIT ATHLETIC CLUB "are nearly identical in terms of sound, appearance and commercial impression," and finding that, "while it is true that the words 'Co.' and 'Club' technically differentiate the marks, those words do little to alleviate the confusion that is likely to ensue.") (quoting *In re Detroit Athletic Co.*, No. 86625093, 2017 WL 2876815 (T.T.A.B. June 2, 2017)); *Stone Lion Capital Partners, L.P.*, 746 F.3d at 1322 (affirming TTAB's finding that the mark STONE LION CAPITAL was similar to the marks LION CAPITAL and LION, finding that

little weight should be accorded to the addition of "Stone" because it did not distinguish the marks in the context of the parties' services).  In fact, the very opposite is true—adding the "authentic" term exacerbates confusion between the marks by suggesting that "Authentic by David Chandler" bats are the "authentic" versions of Plaintiffs' bats.  *See Taylor Wine Co., Inc. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 736 (2d Cir. 1978) (prohibiting defendant's use of a surname without appropriate disclaimers and restraining the use of words such as "Original" because it confuses the public into believing defendant's product originates from plaintiff).

### 3. Similarity of the Goods

Plaintiffs and Defendants are both selling wood baseball bats, in connection with their respective marks.

### 4. Similarity of Sales Method

"Direct competition between the parties is not required for this factor to weigh in favor of a likelihood of confusion, . . . though evidence that the products are sold in the same stores is certainly strong."  *Frehling*, 192 F.3d at 1339.  "The parties' outlets and customer bases need not be identical, but some degree of overlap should be present."  *Id.*  Here, Defendants admit that the retail outlets, trade channels, and customers are generally the same.  Defendants' PFFCL at 79.

### 5. Advertising Methods

"If a plaintiff and a defendant both use the same advertising media, a finding of likelihood of confusion is more probable."  *Turner Greenberg Assocs.*, 320 F. Supp. 2d at 1332.  Again, Defendants agree that the advertising methods are generally the same.  Both companies primarily market their baseball bats for direct sales to consumers, including to MLB players, agents, and equipment managers.  Defendants' PFFCL at 80.

### 6. *Defendants' Intent*

The Court next considers whether "defendant adopted [the] plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation." *Frehling*, 192 F.3d at 1340. Courts are less likely to find intentional infringement where a defendant uses his own name in creating his mark, as in the instant case. *Conagra*, 743 F.2d at 1515 n.9. "An individual generally will be given some opportunity to use his own name and establish a reputation for that name, even in the face of a prior user's trademark rights in the name, so long as the person using the name distinguishes his business and use of the name from the business owning the trademark rights." *Id.* Here, there is evidence that David Chandler tried to disassociate his new company from Plaintiffs' Chandler Bats. *See* Vol. 6, 83:13–85:11 (discussing how Group Authentic intended to avoid confusion with Defendants' marks by making the term "AUTHENTIC" the dominant part of its mark and not using the surname "CHANDLER" without the terms "BY DAVID"). And the proffered evidence that David Chandler tried to maintain an affiliation with Chandler Bats is not strong enough, alone, to support a finding of an intention to infringe.

### 7. *Actual Confusion*

Finally, evidence of actual confusion by actual or potential consumers—though not necessary to find a likelihood of confusion—is the best evidence of a likelihood of confusion. *Fla. Int'l U. Bd. of Trustees v. Fla. Nat'l U., Inc.*, 830 F.3d 1242, 1264 (11th Cir. 2016) (emphasis added). "[I]n assessing the quantum of actual confusion required for a finding in the plaintiff's favor, even a 'very little' amount of actual confusion is highly probative." *Wreal*, 38 F.4th at 137; *Sovereign Military,* 809 F.3d at 1189; *PlayNation*, 924 F.3d at 1167 (explaining "the quantum of evidence needed to show actual confusion is relatively small."). Substantial weight is accorded to instances of actual customers being confused as opposed to other categories of people. *Id.*

Here, Plaintiffs have introduced a few, persuasive instances of actual consumer confusion. For example, one customer contacted Chandler Bats about ordering an "authentics' chandler bats" bat and asked: "What is authentics?  Does that mean it does not come with the chandler logo?  Are they really made by your company or are they fake?  Are they lesser quality?" *See* Ex. P12. Another Chandler Bats customer emailed YC52: "Are your Authentic Chandler bats a lower grade model from your standard Chandler bats?" *See* Ex. P9.  These are precisely the types of confusion evidence that the Eleventh Circuit found sufficient in *PlayNation*.  *See* 924 F.3d at 1167–68.[10] Further, the Eleventh Circuit gives considerable weight to the confusion of actual consumers. *See Fla. Int'l U. Bd. of Trustees*, 830 F.3d at 1264 (acknowledging that a high school student who sent an email to Florida National University inquiring about Florida International University was "an actual prospective student who was actively looking at potential college options" and therefore "undoubtedly" served as "an 'actual consumer' for purposes of the likelihood of confusion analysis").  Josh Morgan, a minor league player, testified that he was originally confused between Chandler Bats and Authentic by David Chandler, believing, at least initially, that they were the same.  *See* Morgan Tr. 23:10–18.  Morgan also texted his agent to order bats, writing, "I want these bats by Authentic Chandler.  I think it's like the new version of the original Chandler."  [ECF No. 182-15] at PLAINTIFFS001956.[11]

---

[10]  Plaintiff, PlayNation, produced two customers who contacted defendant for customer service, believing that defendant manufactured both companies' products.  *Id.*

[11]  The Court does not find the testimony of Dan O'Rourke or Michael Olt persuasive as evidence of actual confusion.  O'Rourke testified that he shipped a bat intended for Group Authentic to YC52, explaining that it was a mistake that occurred during a busy time of the season, and he knew, at the time, that these were distinct companies.  O'Rourke Tr. 18:2–5.  Olt, a former sales manager at YC52, indicated that the Colorado Rockies' clubhouse manager was confused between the Group Authentic and Chandler Bats sales teams. Vol. 2, 88:8–15.  Plaintiffs did not produce the Rockies clubhouse manager to testify about his purported confusion between the bats.

In an attempt to rebut Plaintiffs' evidence of actual confusion, Defendants have advanced survey evidence purportedly establishing the absence of a likelihood of confusion. However, as explained below, said evidence is flawed and therefore unpersuasive.

### i. Defendants' survey evidence is unpersuasive.

Defendants rely on survey evidence to contend that the CHANDLER BATS mark has not acquired secondary meaning and to demonstrate there is no likelihood of confusion between the marks. The surveys are unpersuasive because the universe does not accurately encompass the relevant consumers.[12] *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 800 (11th Cir. 2003). Upon surveying 413 respondents, Harper found a 2.5% net likelihood of confusion as to the source or affiliation or approval of AUTHENTIC BY DAVID CHANDLER as coming from Chandler Bats. Ex. D52 at 31.

Notably, the survey does not include any professional baseball players, despite professional players making up a prominent portion of the relevant consumer base and constituting the primary target of the parties' marketing efforts. Vol. 8, 77:20–78:2, 89:10–16; Ex. P48, at 28; Vol. 5, 120:8–19, 123:9–127:21, 139:6–142:14, 147:5–150:23; Ex. D52 at 12; *see also Royal Palm*, 950 F.3d at 784 n.3 (explaining that the "relevant consuming public" consists only of targeted consumers). Rather, the survey participants consisted of retail customers—over 98% of the universe being parents or guardians of baseball players between the ages of 13 and 22. Given this flawed universe, it should come as no surprise that a third of respondents was unable to distinguish well-known wood baseball bat brands from the mark at issue or prominent brands from fictional marks. Vol. 8, 88:25–98:15; Ex. P48 at 31–33; Vol. 5, 181:4–183:8. Accordingly, the Court affords less weight to this survey evidence. *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d

---

[12] "Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant." 5 *McCarthy* § 32:162.

854, 860–61 (11th Cir. 1983) (affirming district court's finding that the survey universe was too narrow to constitute a fair sampling); *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 844 (11th Cir. 1983) (affording less weight to survey evidence because of technical deficiencies); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 264 (5th Cir. 1980) ("The appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services.").[13]

In sum, the Court finds that a majority of the relevant factors weigh in favor of Plaintiffs. Consequently, there is an appreciable likelihood of confusion among consumers between the Chandler marks and Defendants' "Authentic by David Chandler" mark.

### C. Defendants' Fair Use defense fails.[14]

A defendant is entitled to the fair use defense if it establishes that it used the allegedly infringing term "(1) other than as a mark, (2) in a descriptive sense, and (3) in good faith." *Int'l Stamp Art, Inc. v. U.S. Postal Serv.*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citations omitted). In essence, the fair use defense forbids a trademark registrant from appropriating a descriptive term for its exclusive use, preventing others from accurately describing a characteristic of their goods. *Id.* (citing *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1185 (5th Cir. 1980)). Defendants argue that including "by David Chandler" is merely an accurate description of their goods, constituting fair use.

---

[13] Plaintiffs' lack of survey evidence is not dispositive. *Frehling*, 192 F. 3d at 1241 n.5 (noting that the Eleventh Circuit "has moved away from relying on survey evidence" and as such "the failure to adduce such evidence is not damaging to the Plaintiff's case."); *PlayNation*, 924 F.3d at 1167–68; *see also* 3 *McCarthy* § 23:17 ("[S]urvey evidence is not required to prove a likelihood of confusion" but can be used to fill in the gap "where evidence of likely confusion is not available or is not persuasive.").

[14] Fair use is an affirmative defense whose proponent bears the burden of proof in demonstrating that it applies. *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1259 (11th Cir. 2014).

Defendants' fair use defense fails at the outset, however, because they use "Authentic by David Chandler" as a trademark—branding the surname "Chandler" within the logo of all of Group Authentic's bats.  Vol. 6, 176:12–14.  The following mark appears on Defendants' products:



While the "by David Chandler" portion is smaller and in a different type than AUTHENTIC, it is an inextricable part of the logo—placed within the "ornate" design field.  This is an important distinction from instances in which courts have found challenged language was not "in use" as a mark because of a disconnection or disaffiliation from defendant's branding.  *See Rauch Indus., Inc. v. Radko*, No. 1:22-CV-00909-MKV, 2022 WL 769385, at *8–9 (S.D.N.Y. Mar. 14, 2022) (finding defendant used his name other than as a mark where the challenged words were accompanied by defendant's own, conspicuously visible mark).  Given that "by David Chandler" is emblazoned on all of Defendants' bats, they simply cannot show that the surname is being used other than as a mark.  And Defendants have not marshalled any additional evidence or argument to meet their burden for this affirmative defense.[15]  *Pedraza-Victoria v. Villa Bellini Ristorante &*

---

[15]  Defendants rely on a number of inapposite authorities, involving the use of a trademarked surname in a non-trademark manner or cases that do not invoke the fair use defense.  In *Madrigal Audio Labs. v. Cello, Ltd.*, 799 F.2d 814 (2d Cir. 1986)—Defendants' main source—Mark Levinson, an audio designer who left his original company and founded another audio company called Cello, attached a silver plate to his new audio products with the phrase *"Cello by Mark Levinson"* and issued promotional brochures with that same "*Cello by Mark Levinson*" phrase.  The Court entered an initial preliminary injunction, barring Levinson from using his name.  *Id.* at 816–18.  Following entry of the first injunction, Cello (Mark Levinson) removed

*Lounge Inc.*, No. 8:18-CV-1556-T-36JSS, 2020 WL 224531, at *3 (M.D. Fla. Jan. 15, 2020) (noting defendant bears the burden of establishing an affirmative defense with supporting evidence).

## II. Plaintiffs have demonstrated a likelihood of success on the merits for part of their trade secrets claim.

Plaintiffs have brought their claim for misappropriation of trade secrets under the DTSA, 18 U.S.C. § 1836.[16]  Specifically, Plaintiffs claim trade secret protection in the entire formula, ingredients/suppliers, and process set forth in the document that David Chandler provided to La Potencia, titled "Chandler Bat Making Process," including the specific ingredients in use ███████  ████████████████████████████████████████████████████  *See* J19. Additionally, Plaintiffs claim trade secret protection in ██████████████████████  ███████████████████████  The finish and coating formula can be broken down into ████████████████ :

---

the *"Cello by Mark Levinson"* plates and discontinued the brochures. *Id.* at 818.  At issue in *Madrigal* for the <u>second</u> injunction was not whether Levinson could use his name as part of a trademark, but rather whether he could promote that he worked with a new company in promotional materials. *Id.* at 823 (When an individual sells no more than the right to use his name as a trade name or trademark he is precluded only from using his personal name as part of that of another company or on other products . . . and not from taking advantage of his individual reputation (as opposed to the reputation of the company which bore his personal name as a trade name) by establishing a company which competes against the purchaser of the trade name . . . or from advertising, in a not overly intrusive manner, that he is affiliated with a new company.") (citations omitted).

[16]  The DTSA defines a trade secret as: all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

    (A) the owner thereof has taken reasonable measures to keep such information secret; and
    (B) the information derives independent economic value, actual or potential, from not being generally
        known to, and not being readily ascertainable through proper means by, another person who can
        obtain economic value from the disclosure or use of the information.



A plaintiff seeking to protect a valid trade secret under the DTSA must establish that "(1) it owns a valid trade secret; (2) the trade secret relates to a product or service used in, or intended for use in, interstate commerce; and (3) a defendant misappropriated that trade secret." *Florida Beauty Flora Inc. v. Pro Intermodal L.L.C.*, No. 20-20966, 2021 WL 1945821, *4 (S.D. Fla. May 14, 2021); 18 U.S.C. § 1836(b)(1).[17]  To establish that a plaintiff owns a valid trade secret, it must show that it "possessed information of independent economic value that (a) was lawfully owned by the plaintiff and (b) for which the plaintiff 'took reasonable measures to keep secret." *Sentry Data Systems, Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1292 (S.D. Fla. 2018) (citations omitted).

As explained below, although the scope of Plaintiffs' purported trade secret is overbroad, they have sufficiently demonstrated that ███████████████████ constitutes a valid trade secret, which Defendants have misappropriated.  The latter two aspects of the DTSA standard are not in serious contention; the bats were sold in interstate commerce, and Defendants have admitted to using ███████████████████████████ ████████████████████.  *See* J24; P15.  The court will address each factor in turn.

---

[17]   The Eleventh Circuit notes that the "DTSA creates a federal cause of action that largely mirrors [the Florida Uniform Trade Secrets Act]." *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 n.13 (11th Cir. 2020) (applying the same "substantive standard for misappropriation" to both the DTSA and FUTSA). As such, cases alleging a violation of the FUTSA are instructive.

### A.  Plaintiffs own a valid trade secret.

As previously explained, the Court rejects the contention that Plaintiffs do not own the alleged trade secrets.[18]  Pursuant to the terms of the Loan Agreement and letter transferring the collateral to La Potencia, the "Collateral" included "All Accounts, including the Receivables, . . . all General Intangible . . . Trademarks," "Tradenames," "Know-how," "**trade secrets**," and "**Formulas**."  *See* Omnibus Order Granting Plaintiffs' and Third-Party Defendants' Motion to Dismiss Amended Counterclaims, [ECF No. 276], at 9–10.  The Loan Agreement also defined "Confidential Information" to include "Borrower's [RxSport's] trade secrets" and "methods and procedures."  Ex. J59 § 4.10(a).[19]  At the Hearing, David Chandler further confirmed the collateral in the letter included "Know-how," "trade secrets," "formulas," and that "formulas" referred to "how you mix finishes."  *See* Vol. 6, 146:23–147:18, 148:5–7.  After the transfer of collateral in 2019, YC52, as La Potencia's licensee, began operating the Chandler Bats business—making bats with the Chandler Bats formula.

#### 1.  Portions of the bat-making formula were kept secret.

"In a trade secret action, the plaintiff bears the burden of demonstrating both that the specific information it seeks to protect is secret and that it has taken reasonable steps to protect this secrecy."  *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998).  Information publicly known or easily accessible to third parties does not qualify for

---

[18]  Defendants argue that David Chandler invented the formulas in 2008 but never transferred them to RxSport when it was formed in 2009.  Thus, Defendants assert, RxSport could not have transferred the formula to La Potencia.  *See* Reply in Support of Defendants' PFFCL [ECF No. 281].  But this contention is belied by the record evidence.

[19]  Despite Defendants' numerous attempts to resist the terms of the transfer of trademarks and trade secrets to Plaintiffs, the Court is unmoved.  Defendants essentially seek rescission of the outcome of the bankruptcy proceeding.  At this stage, the Court treats this argument as an affirmative defense, and Defendants bear the burden of demonstrating a likelihood that said defense will succeed.  *MC3 Invs. LLC v. Loc. Brand, Inc.*, 661 F. Supp. 3d 1145, 1159 (N.D. Fla. 2023) (citing *Swain v. Junior*, 958 F.3d 1081, 1092 (11th Cir. 2020)).  However, Defendants have failed to lay out their argument or facts in support of such a defense.

protection.   *Id.*   Under the DTSA, there "is no precise definition" of what constitutes "reasonable measures" to ensure secrecy.   *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 768 (10th Cir. 2011).   Measures can qualify as "reasonable" even if they are imperfect or they ultimately fail to thwart misappropriation.   *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 542 (7th Cir. 2021).   The owner of a trade secret is not required to employ all possible measures to preserve secrecy.   *Id.*   Thus, the reasonableness of a plaintiff's efforts to maintain secrecy depends on the particular circumstances of each case.   *Adler v. Loyd*, 496 F. Supp. 3d 269, 281 (D.D.C. 2020).   Assessing the reasonableness of measures taken to ensure secrecy is a factually intensive endeavor.   *WWMAP, LLC v. Birth Your Way Midwifery*, No. 5:23-CV-243-MJF, 2024 WL 151411, at *4–5 (N.D. Fla. Jan. 10, 2024) (finding storage of trade secrets in secure accounts with third-party service providers, use of passwords, limitations on access to trade secrets based on employee's duties, and prompt revocation of information technology access upon termination of employee constituted reasonable measures to ensure secrecy of relevant information).

Defendants argue that there were periods when the purported trade secrets were disclosed to those under no obligation to protect their confidentiality, particularly while RxSport operated the Chandler Bats business.   Specifically, Defendants argue that employees and vendors did not sign perpetual confidentiality agreements and the purported trade secrets were freely revealed. Defendants therefore contend that trade secret status was extinguished before Plaintiffs acquired rights to them.   Testimony at the Hearing and proffered evidence, however, establishes that ██████ ████████████████████████████████████████████████████████████████ were kept secret.[20]   *See VAS Aero Services, LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1359–60 (S.D. Fla.

---

[20]  The Court finds that the *combination* of these ingredients constitutes the trade secret and not the distinct ingredients themselves because Plaintiffs have not sufficiently established that these ingredients are not readily ascertainable by the public, as explained herein.

2012) (granting preliminary injunction and finding that plaintiffs undertook "substantial security procedures" to maintain secrecy by implementing non-disclosure provisions and permitting only a few key employees access to trade secrets and facilities housing the protected documents); *Marlite, Inc. v. Eckenrod*, No. 09-22607, 2011 WL 39130, at *7 (S.D. Fla. Jan. 5, 2011) (holding that plaintiff presented sufficient evidence for the jury to determine that they took reasonable steps to maintain confidentiality of trade secrets through limiting employee access to the database dependent on individual employee's function and implementing restrictive computer policy and confidentiality agreements, among other actions), *aff'd sub nom. Marlite, Inc. v. Am. Canas*, 453 F. App'x 938 (11th Cir. 2012).

The Court finds that both RxSport and YC52 adopted security measures sufficient to prevent the trade secrets from becoming generally known. These reasonable measures included executing confidentiality agreements;[21] implementing layers of protection for certain components ██████████████ (replacing labels with generic symbols only known to a few employees); and compartmentalizing the application and manufacturing processes for the coats/finishes. Because the evidence supports that RxSport took reasonable efforts to maintain the trade secrets in secret, trade secret status was not extinguished before the transfer of assets to La Potencia. And La Potencia appears to have continued and enhanced these efforts.

---

[21] David Chandler argues that he was no longer subject to a confidentiality agreement when he revealed the bat-making process to third parties. However, the confidentiality agreements at issue constitute evidence of reasonable efforts to maintain secrecy, and the lack of a perpetual confidentiality agreement binding a party aware of the confidential nature of the formula is not fatal to Plaintiffs' claim. *See Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1550 (11th Cir. 1996) (recognizing implied confidential relationships as sufficient to trigger trade secret liability under Florida law where the party claiming trade secret misappropriation made it clear to parties that there was an "expectation and obligation of confidentiality."). Here, the testimony of former RxSport employees and the text messages detailed above establish that David Chandler held the utmost expectation of confidentiality. *See* [ECF Nos. 229-8, 229-9] (texting, for instance, "A few secrets that I won't even patent."; "My staff signs their lives away."; "Please keep the finish technology under wraps. I can put faith in you as a good measure but I trust no one."; "and yes, the NDA/CA helps create a bit of warm and fuzzy feeling, but I simply wanted to reiterate it, as well.").

## 2. The trade secret derives independent economic value from not being generally known and is not readily ascertainable.

Plaintiffs have demonstrated the combination ███████████████████ on baseball bats derives economic value from not being generally known and is not readily ascertainable—despite the component ingredients being readily ascertainable or generally known in the industry. "Information that is generally known or readily accessible to third parties cannot qualify for trade secret protection." *Am. Red Cross*, 143 F.3d at 1410. But the fact that some of the constituent parts of the information may be publicly available does not negate trade secret protection through compilation. *See Capital Asset Research Corp. v. Finnegan*, 160 F.3d 683, 686 (11th Cir. 1998) ("Even if all of the information is publicly available, a unique compilation of that information, which adds value to the information, also may qualify as a trade secret."); *see also Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 341 (E.D.N.Y. 2020) (explaining that "[w]hile the identity of plaintiff's customers may be readily ascertainable from public sources . . . [the plaintiff's] pricing information and client contacts may not be").

While the combination ████████████████ for the coating and finish process is a trade secret, the discrete ingredients do not warrant the same protections. Defendants have provided evidence that each of the component ingredients is readily ascertainable from public sources and/or implemented by other bat-makers.[22] Further, the vendors are not parties to confidentiality agreements. *See* Vol. 3, 111:14–113:7; *DePuy Synthes Prod., Inc. v. Veterinary Orthopedic Implants, Inc.*, 990 F.3d 1364, 1372 (Fed. Cir. 2021) ("Without any express agreement or other evidence of a confidential relationship . . . efforts to keep the Manufacturer Identity

---

[22] *See* Vol. 6, 197:15–199:11; [ECF No. 228-11] at GADC0001909-1911. Further, ████████████ ██████████████████████████████ is not a trade secret because it is similarly readily ascertainable and applied throughout the industry. D113; D114; Nejad Tr., 40:2–41:13; 100:22–101:9; 118:19–120:15; Vol. 7, 36:23–5.

confidential are not sufficient, in and of themselves, to constitute 'reasonable efforts' within the meaning of the FUTSA.") (quoting *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1299–301 (11th Cir. 2018)).  For similar reasons, the Court does not find that Plaintiffs have established that a generic combination ███████████████ for the finish and coating constitutes a trade secret because of credible evidence that such a combination is already known and/or readily ascertainable.  *See* Dr. Mojgan Nejad Expert Report ("Nejad Report"), [ECF No. 193-16] at 8–9; [ECF No. 228-11].  Accordingly, the Court limits trade secret protection to the brand-specific combination.

Finally, David Chandler testified he would have taken issue if a competitor had learned of the Chandler Bats' manufacturing process—and did not want to make it easy for others to replicate his formula. Vol. 6, 135:14–19.  If the trade secret were disseminated, competitors would learn how to make Chandler bats and could create identical bats while undercutting prices without investing the time and resources in developing the combination.  *VAS Aero Servs., LLC*, 860 F. Supp. 2d at 1359 (finding strategic business arrangement document constituted a trade secret, in part because it derived economic value from not being generally known by its competitors; if a competitor obtained the documents, it could forgo investing significant time and resources in establishing a supplier relationship with an industry leader).  This testimony further supports the Court's finding that trade secret protection is warranted as to the brand-specific combination.

### B.  Defendants misappropriated the trade secret.

Having established the contours of the trade secret, the Court finds that Defendants have misappropriated the trade secret.  A trade secret is "misappropriated by, *inter alia*, 'disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or

limit the use of the trade secret; or . . . derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret.'" *Sentry Data Sys., Inc.*, 361 F. Supp. 3d at 1292–93 (quoting 18 U.S.C. § 1839(5)(B)). "[T]he bar for what counts as 'use' of a trade secret is generally low." *Compulife Software, Inc.*, 959 F.3d at 1313; *Penalty Kick Mgmt. v. Coca Cola Co.*, 318 F.3d 1284, 1292 (11th Cir. 2003) ("[A]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'" (quoting Restatement (Third) of Unfair Competition § 40 cmt. c (1995)).

Here, Group Authentic and MaxBat have admitted to using ████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████. *See* Vol. 6, 204:4–14 (David Chandler testifying as to his continued use of the combination ██████████████████████████ for Group Authentic); [ECF No. 188-18]; [ECF No. 188-59]. While Defendants may have adjusted the ratios of these inputs, the trade secret at issue encompasses this particular combination.

As explained above, based on credible testimony and evidence presented at the Hearing, David Chandler knew or had reason to know of a duty to maintain the secrecy of the trade secret. *New Country Motor Cars of Palm Beach, LLC v. Beresford*, No. 17-80856, 2019 WL 3890456, at *8 (S.D. Fla. May 3, 2019) (stating that "[m]isappropriation . . . is a forgone conclusion where a trusted employee discloses trade secrets after receiving them under circumstances of obvious confidentiality and contractual obligations") (citations omitted); *Hurry Family Revocable Tr. v. Frankel*, 8:18-CV-2869-T-33CPT, 2019 WL 2868945, at *3 (M.D. Fla. July 3, 2019) (finding that forwarding emails from a work account to a personal account may constitute misappropriation under the DTSA).

Moreover, MaxBat cannot escape injunctive liability, as a party that used the trade secret, derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret. *Salsbury Laboratories, Inc. v. Merieux Laboratories, Inc.*, 908 F.2d 706, 712–14 (11th Cir. 1990) (concluding that the record supported the inference that the defendant company, Merieux, was liable, along with its employees, for misappropriation of its competitor's trade secrets, where evidence indicated: "[1] Merieux was fully aware of Hildebrand's role in the development, production and licensing of MG-BAC at Salsbury[;] [2] Merieux began development of a competing vaccine only after Hildebrand was hired[;] [and] [3] the relationship between Merieux and Hildebrand . . . was such that the company knew of and had an interest in [the employees' work] at Salsbury and subsequently at Merieux."). MaxBat's representative, Paul Johnson, testified at the Hearing that MaxBat uses a combination ███████████████████ (including on non-Group Authentic bats) and only began using these ingredients after David Chandler introduced them. Vol. 7, 55:1–8, 67:16–68:9. Johnson was aware that David Chandler was no longer associated with Chandler Bats by the time they first met to discuss manufacturing Group Authentic bats. *Id.* at 51:2–12. Finally, there is no evidence that Plaintiffs consented to Defendants' use or disclosure of the trade secret.

### C.  Defendants' Reverse Engineering defense fails.

The DTSA expressly addresses a reverse engineering defense to trade secret misappropriation, excluding reverse engineering from the conduct defined as misappropriation. 18 U.S.C. § 1839(6). Defendants retained Dr. Nejad as an expert witness to analyze sample Chandler bats and attempt to reverse engineer them. Defendants' expert was unable to reverse engineer the bats but opined that reverse engineering was possible. Nejad Report at 1. However, actual, not theoretical, reverse engineering is essential to the defense. *Compulife*, 959 F.3d at 1312 n.14 ("The

defendants here don't argue that they reverse-engineered any trade secret, so we needn't address the reverse-engineering question."); *see also Mallet and Company Inc. v. Lacayo*, 16 F.4th 364, 387 n.31 (3d Cir. 2021) ("[W]hile reverse engineering is a defense to misappropriation of [a] trade secrets claim, the possibility that a trade secret *might* be reverse engineered is not a defense . . . To hold otherwise would fly in the face of commonsense and allow a defendant to escape liability for unlawfully stealing trade secrets as long as someone might—hypothetically and at unknown cost in time, effort, and money—figure out some means to discover them through reverse engineering.") (cleaned up); *Medtronic MiniMed, Inc. v. Nova Biomedical Corp.*, No. CV0800788SJOPJWX, 2009 WL 10672947, at *2 (C.D. Cal. Aug. 14, 2009) ("The fact that a matter may be *susceptible* of independent development or reverse engineering does not thereby make it 'generally known' or 'readily ascertainable by proper means.'  It is actual, not theoretical, independent development or reverse engineering that serves as a defense.").  Here, Defendants have not met their burden for a reverse engineering defense because no reverse engineering was achieved.

In sum, a portion of Plaintiffs' alleged trade secret warrants protection and Defendants have failed to rebut the record evidence through a reverse engineering defense.

## III.  Irreparable Harm

To obtain injunctive relief, Plaintiffs must establish that they will suffer irreparable harm if an injunction were denied.  *Davidoff*, 263 F.3d at 1304.  In no uncertain terms, the Eleventh Circuit has provided, "the loss of customers and goodwill is an irreparable injury."  *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 780 (11th Cir. 2015) (quoting *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)).  Here, Plaintiffs' harm is properly characterized as irreparable—particularly where Defendants have made no indication that they will cease implementing the trade secret or using the Chandler language as a mark.

The Eleventh Circuit has held "that a sufficiently strong showing of likelihood of confusion caused by trademark infringement <u>may by itself</u> constitute a showing of a substantial threat of irreparable harm." *Boulan South Beach Master Ass'n., Inc. v. Think Properties, LLC*, 617 F. App'x 931, 934 (11th Cir. 2015) (emphasis added).  In reversing a finding of lack of irreparable harm in a trademark infringement case, the Eleventh Circuit concluded that "a remedy at law for consumer confusion or reputational damage is ordinarily inadequate, given the potential difficulty of proof of plaintiff's damages and the impairment of intangible values." *Id.* (internal quotations omitted). Plaintiffs have presented strong evidence of a likelihood of confusion, including instances of actual confusion, in support of their claim for trademark infringement.  *McDonald's*, 147 F.3d at 1310 ("[A] substantial likelihood of confusion—indeed, a certainty of confusion . . . exists . . . Consequently, the district court correctly concluded that McDonald's made a sufficient showing of irreparable injury to justify entry of the preliminary injunction.").  Thus, a substantial threat of irreparable injury is readily apparent here.  *Ferrellgas Partners, L.P.*, 143 F. App'x at 190–91 ("A plaintiff need not show that the infringer acted in such a way as to damage the reputation of the plaintiff.  It is the loss of control of one's reputation by the adoption of a confusingly similar mark that supplies the substantial threat of irreparable harm.").

The DTSA also provides that injunctive relief is appropriate "to prevent any actual or threatened misappropriation" of trade secrets. 18 U.S.C. § 1836(3).  "[C]ourts have routinely held that a defendant's use of proprietary information to solicit customers and clients to a direct competitor of the plaintiff risks irreparable loss of customers and business, goodwill, and market position and competitiveness." *Anchor Title & Escrow, LLC v. Omega Nat'l Title Agency, LLC*, No. 3:23CV8043-TKW-HTC, 2023 WL 3564942, at *2 (N.D. Fla. Apr. 14, 2023) (collecting cases); *see also VAS Aero Services, LLC*, 860 F. Supp. 2d at 1363 ("If the information [defendant] purportedly has in his possession was disseminated to [plaintiff's] competitors, [plaintiff] would

unquestionably suffer irreparable harm."). "Furthermore, when the damages that might be suffered are speculative—as in the case of misappropriated trade secrets—the harm is properly characterized as irreparable because an inadequate remedy at law is presumed." *All Leisure Holidays Ltd. v. Novello*, No. 12-62328, 2012 WL 5932364, at *5 (S.D. Fla. Nov. 27, 2012).

The Court is persuaded that Defendants' ongoing use of Plaintiffs' trade secrets and trademarks has and will continue to cost Plaintiffs the loss of customers to its direct competitor and the diminishment of goodwill. Vol. 3, 85:2–88:2; *Seacoast Banking Corp. of Florida v. Diemer*, No. 6:20-CV-57-ORL-37LR, 2020 WL 1674309, at *4 (M.D. Fla. Jan. 17, 2020). Consequently, Plaintiffs have sufficiently demonstrated irreparable injury resulting from both Defendants' trademark infringement and trade secret misappropriation.

### IV.   Injury to Defendants and Balance of Hardships

Defendants' injury in being prohibited from using "by Chandler" in their marks and using the trade secret is outweighed by the harm to Plaintiffs.  In intellectual property cases, "the probable loss of consumer goodwill for [the plaintiff] outweighs the cost of delay that [the defendant] will incur in not being able to sell [the infringing products] until a decision on the merits." *Davidoff*, 263 F.3d at 1304.

The harm to Defendants is also mitigated by the narrowly tailored preliminary injunction set forth herein. *Fortiline, Inc. v. Moody*, No. 12-81271, 2013 WL 12101142, at *5 (S.D. Fla. Jan. 7, 2013).  Importantly, Defendants are not being enjoined from participating in the bat-making business; they can sell bats under a different trademark and use a different finishing formula. Notably, David Chandler testified that he could develop substantially similar—if not better— versions of the bats with alternate brands.  Vol. 6, 203:23–205:3.  The Court is therefore persuaded that the injuries to Defendants are appropriate on balance.

### V.  Public Interest

Defendants argue that an injunction restricts competition, harming the public interest. Defendants' argument is inapposite, however, where the Court has found a likelihood of success on the merits for the trademark infringement and trade secret claims.  Concerning the trademark injunction, "the public interest is served by preventing consumer confusion in the marketplace." *Davidoff*, 263 F.3d at 1304; *see also Nailtiques Cosmetic Corp. v. Salon Sciences, Corp.*, No. 96-2709, 1997 WL 244746, *5 (S.D. Fla. Jan. 10, 1997) ("The public as a whole has a paramount interest not to be confused by defendant's infringement.") (citation omitted).  An injunction against an infringing use almost always serves the public interest "by avoiding the inevitable . . . confusion that would otherwise result." *Tally–Ho, Inc. v. Coast Community College Dist.,* 889 F.2d 1018, 1029 (11th Cir. 1989); *Clayton v. Howard Johnson Franchise Systems, Inc.,* 730 F. Supp. 1553, 1562 (M.D. Fla. 1988) ("[G]ranting the injunction will serve the public interest by preventing consumer confusion.").

Next, an injunction serves "the public's interest in protecting business entities from the misappropriation of confidential information and trade secrets." *Advantus, Corp. v. Egan*, No. 3:23-CV-1393-MMH-PDB, 2023 WL 8373383, *5 (M.D. Fla. Dec. 4, 2023); *see also VAS Aero Servs., LLC*, 860 F. Supp. 2d at 1363 (finding that a preliminary injunction "would affirmatively serve the public interest by protecting businesses from employees who misappropriate trade secrets").  Public interest favors the protection of trade secrets and validating their proprietary nature. *See Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 142 (D. Md. 2020) (granting preliminary injunction on DTSA claim); *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016) (holding "the public interest is served when defendant is asked to do no more than abide by trade laws . . . [and] is also served by enabling the protection of trade secrets.").

Here, a preliminary injunction will serve the public interest by preventing consumer confusion between Plaintiffs' Chandler marks and Group Authentic's "Authentic by David Chandler" brand.  Further, the preliminary injunction protects the proprietary nature of trade secrets.

### VI. Bond

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The amount of security is within the discretion of this Court.  *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005); *Carillion Importers, Ltd. v. Franke Pesce Int'l Group, ltd.*, 112 F.3d 1125, 1127 (11th Cir. 1997).

Here, the Court will require Plaintiffs to post a $100,000.00 security bond within fourteen (14) days of entry of this Order for the duration of the preliminary injunction.  *See VAS Aero Services*, 860 F. Supp. 2d at 1363 (requiring $25,000 bond in misappropriation of trade secret case); *Davidoff & Cie SA v. PLD Int'l Corp.*, No. 00-2635, 2000 WL 1901542, at *5 (S.D. Fla. Sept. 25, 2000) (requiring $60,000.00 bond in trademark infringement case).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs have established a likelihood of success at trial, irreparable injury, a balancing of the equities favoring Plaintiffs, and the need to serve the public interest.  Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Plaintiffs' Renewed Motion for Preliminary Injunction is **GRANTED**.  Defendants, DAVID CHANDLER; GROUP AUTHENTIC, LLC; MAXBAT, INCORPORATED; PECOS LEAGUE OF PROFESSIONAL BASEBALL CLUBS, LLC; and BESTBATDEALS.COM, as well as their respective officers, agents, and employees,

and all persons or entities who are in active concert or participation with Defendants ("Injunction Parties"), are hereby Enjoined, Restrained, and Prohibited as follows:

1.      Defendants and the Injunction Parties shall immediately cease and desist all use whatsoever of the combination ████████████████████ and application of said combination on baseball bats ("Trade Secret").

2.      Defendants and the Injunction Parties are hereby immediately enjoined and prohibited from disclosing the Trade Secret to any third parties.  Defendants and the Injunction Parties shall refrain from disclosing the Trade Secret to any third parties and shall destroy all copies of the "flowchart" provided by David Chandler to MaxBat for making Group Authentic bats.

3.      Defendants and the Injunction Parties shall immediately cease and desist all use of the "Authentic by David Chandler" mark and are hereby enjoined and prohibited from using any trademark that contains the term or name "Chandler."  Such usage includes marketing, advertising, selling, and/or providing any of Defendants' goods and services, including on baseball bats or related goods, buildings, signage, product labels, websites, social media accounts, source identifiers, on the internet, as or in domain names, email addresses, meta tags, keywords, search engines, Google AdWords, computer source coding, or invisible data.

4.      Defendants shall file with this Court and serve upon Plaintiffs within **thirty (30) days** a report in writing under oath, setting forth in detail the manner and form in which Defendants have complied with this preliminary injunction.

5.      Within **fourteen (14) days**, Plaintiffs shall post a **$100,000 bond** with the Clerk of Court for the duration of the preliminary injunction.

6.      This preliminary injunction shall remain in full force and effect until further order of the Court.

**DONE AND ORDERED** in Miami, Florida, this 19th day of April, 2024.

_____

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**